# THE MISSISSIPPI RIVER BRIDGE COMPANY

*v.*

## PATRICK LONERGAN.

1. FERRY FRANCHISE *across navigable river—paramount authority of Congress to erect bridges and provide for improving the navigation.* The legislature of the State, in granting a charter for a ferry across the Mississippi river, can not give the grantee any right which will hinder or in any manner obstruct the free navigation of the river, or impede the commerce of the country along or across the river.

2. Where a bridge was built across the Mississippi river, and a dike constructed, under and in pursuance of an act of Congress, the bridge connecting two great thoroughfares by rail and promoting the commercial interests of the country, and the dike improving the navigation of the river by throwing more water into the main channel, it was *held,* that the owner of a ferry franchise could not recover damages against the bridge company for any injury he might sustain in consequence of the making of the dike preventing him, at times, from landing his ferry on certain lands used by him for a landing.

3. A party receiving a grant of a ferry privilege across a navigable river, accepts the right to cross the stream and land on its banks with the implied understanding that Congress may, at any time when the public good and the commercial interests of the country require it, in the exercise of the power to regulate commerce, authorize a bridge to be erected and dikes to be placed in the river to change the current, and thus facilitate the navigation of the river; and although the owner of the ferry franchise may be somewhat damaged in his franchise by the exercise of this power, he can maintain no action to recover such damages.

4. TITLE—*to enable one to recover for injury to land.* Where a person sues for an injury to land of which he alleges he is owner, proof of the averment of ownership is essential to his right of recovery.

5. SAME—*in respect to injury to ferry franchise.* A ferry franchise being an incorporeal hereditament, the legal title can only be transferred by deed. But where a ferry franchise, including the boat and all appurtenances, is sold, without a conveyance by deed, the price paid, and the purchaser put in possession by the owner, the purchaser will have an equitable title, and he may recover, at law, for an injury to the property, caused by the unauthorized act of a stranger.

6. LIMITATIONS—*possession of land—what constitutes, and of its extent.* Where the owner of a ferry franchise upon a river, in suing for an injury thereto, and to lands adjacent, claimed under an adverse possession of the land for twenty years, it was *held,* the fact that ferry boats landed along the shore of

the land at such points as convenience or the condition of the river might render most suitable, where no improvements of any character had been made, for a landing or otherwise, could not be regarded as such evidence of possession of the land as would, if held for the requisite period, ripen into a title adverse to the true owner.

7. The occupation of a part of an uninclosed tract of land, by building a house thereon, without any deed or paper title, is a possession only of the part actually occupied, and not of the whole, as would be the case if the occupant had a paper title.

APPEAL from the Circuit Court of Pike county; the Hon. CHAUNCEY L. HIGBEE, Judge, presiding.

Mr. C. BECKWITH, Mr. A. C. MATTHEWS, and Mr. W. A. GRIMSHAW, for the appellant.

Messrs. WAGNER, DYER & EMMONS, for the appellee.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

This was an action on the case, brought by Patrick Lonergan against the Mississippi River Bridge Company, to recover damages claimed to have been sustained to certain lands on the east bank of the Mississippi river, opposite the city of Louisiana, and to a ferry franchise, which conferred the right to the use of the river from the lands to the city. The lands claimed to be owned by the plaintiff were known as the "Hewed Log House tract," the "McPike tract," and a ferry landing in part of the "Jones tract."

It is claimed that the lands and ferry franchise were damaged by the erection of a certain dike by the bridge company, commencing on the bank of the river, on the McPike tract, and extending into the river 2500 feet, in the direction of a sand bar Z, shown on a plat in evidence in the case. The dike was constructed for the purpose of forcing the flow of the water in the direction of a draw span of a railroad bridge, which was erected by the bridge company across the river. It is claimed that ice would be drifted across the river and

would accumulate above the dike, which would interfere with the landing of ferry boats, and the channel below would be filled with sand, which might wash over the dike in high water, and thus the landing below the dike would be injured. The plaintiff, in his declaration, averred that he was the owner of the lands which he claimed had been damaged by the erection of the dike, and on the trial he attempted to establish, by evidence, the truth of the averment. If he was not the owner of the lands, although they may have been damaged, he would not be entitled to recover such damages.

The first question, therefore, that demands consideration is, whether the evidence established title in the plaintiff.

In regard to the Hewed Log House tract the following deeds were offered: First, a deed dated June 8, 1865, made by Silas W. Furber and Frank Burnett to Joel K. Shaw; second, a deed dated June 16, 1866, from Joel K. Shaw to James B. Thurman; third, a deed dated March 4, 1873, from James B. Thurman to plaintiff. This was the only paper title shown to the tract in question.

To establish title to the McPike tract, the following were the only deeds offered in evidence: First, a deed dated September 14, 1866, made by A. McPike, administrator of the estate of Wm. McPike, deceased, to James B. Thurman; second, a deed dated March 4, 1873, from James B. Thurman to plaintiff.

That the deeds read in evidence can not be regarded as sufficient to establish title to the lands in the plaintiff is so evident, that a mere statement of the facts is sufficient.

But, it is said the lands were in the possession of McPike and Burnett, and those claiming under them, for more than twenty years before the commencement of the suit, and possession is relied upon as proof of title. The lands were never inclosed, nor were they ever in cultivation or adapted to farming purposes. The only evidence of possession we find in the record is, the landing of a ferry boat along the shore, at such places as might, from time to time, be most suitable or conve-

nient, and the further fact that some thirty years ago a log house stood on each tract, which houses were occupied by the Burnetts and McPike.    There is no evidence that the houses are still standing, and, for aught that appears, they had gone to decay long before the plaintiff acquired any claim to the property.    It does not appear that McPike or Burnett occupied either tract under a deed or paper title.    The possession would not, therefore, embrace any portion of the land except that actually occupied.    Had they built a house on a part, under a deed for each tract, then the possession would have been co-extensive with the description of the land embraced in the deed, and the claim of twenty years' possession might have been availing.    But such was not the case.

The first deed conveying the Hewed Log House tract was made in 1865, and the first deed executed conveying the McPike tract was made in 1866.    Now, if it be conceded that the grantees in those deeds, and their grantors, have, from the time the first deed was executed, been in possession of a part of the land, claiming title to the whole, as twenty years have not expired, the evidence is not sufficient to establish title by possession.

In the declaration it was alleged, that plaintiff was the owner of the right and privilege of using, for ferry purposes, the front of the James (or White House) tract.    No chain of title was established to this land.    No improvement of any description had been made on the bank of the river, on this or either of the other tracts, to facilitate the landing of boats. The fact that boats landed along the shore, at such points as convenience or the condition of the river might make most suitable, where no improvements of any character had been made, can not be regarded as such evidence of possession of the lands as would, if held for the requisite period, ripen into a title adverse to the true owner.

Our conclusion on this branch of the case, therefore, is, as the plaintiff failed to establish title to the lands described in the declaration, the court erred in instructing the jury, in sub-

· stance, that plaintiff might recover for damages sustained to the lands on account of the erection of the dike.

We now come to the main question in the case: whether plaintiff, under the evidence, was entitled to recover such damages as he may have sustained to the ferry franchise, on account of the erection of the dike.

On the 2d day of March, 1855, the legislature of Missouri granted a ferry franchise to B. F. and W. Burnett, across the Mississippi river, at Louisiana, for twenty years. On the 10th day of February, 1859, the General Assembly of the State of Illinois granted a ferry franchise to the same parties to maintain a ferry across the Mississippi river, from sec. 13, township 7 south, range 6 west, in Pike county. The first section of the act contains this provision: "They shall have the exclusive right to ferry across said river from said section, and within three miles above and below said section, in said river, for the term of twenty years." On the 8th day of June, 1865, the ferry franchise was conveyed to Joel K. Shaw, who, on the 16th day of January, 1866, conveyed to James B. Thurman. Afterwards, and on the 16th of February, 1867, the General Assembly of this State passed an act reciting that the rights formerly granted to W. and F. Burnett, in and to the ferry, belonged to James B. Thurman, and extended the franchise to him for a period of twenty years. In March, 1873, James B. Thurman sold the ferry boat "City of Louisiana," with her appurtenances, to the plaintiff, who went into the possession and use of the ferry under his purchase, but no deed was made.

It was contended in the argument, that the plaintiff failed to establish title to the ferry franchise, and on this ground, regardless of other questions, could not recover. A ferry franchise being an incorporeal hereditament, the legal title can only be transferred by deed, as held in *Dundy* v. *Chambers*, 23 Ill. 369. But here the plaintiff bought and paid for the property, and was placed in the full possession of the same by the owner, under such purchase, and while he did

not have the legal title, he had the equitable title to the property. He was, in fact, the owner, and if his property was damaged by the unauthorized act of a stranger, we are inclined to the opinion the laws would afford him a remedy, to the extent of all damages sustained. This was the view taken by the circuit court, and we think it is correct.

But the important question in the case is, whether plaintiff has been disturbed in the exercise of any right conferred by the act of the legislature which granted the ferry franchise. The act of 1859, from which plaintiff derived all the rights which he can exercise, conferred the power to cross the Mississippi river at a certain point, land ferry boats on a certain section and within three miles above and below the section, to collect fare for the transportation of persons and property over the river, and the right of ferriage was made exclusive at this point for a definite period. These were the rights and the powers conferred, and no others.

In *Mills* v. *County of St. Clair*, 2 Gilm. 197, where the nature and extent of a ferry franchise were considered, it was said: "A ferry franchise is neither more nor less than a right conferred to land at a particular point, and secure toll for the transportation of passengers and property from that point across a stream."

The right seems to be a limited one, and it can not be extended beyond the plain import of the language contained in the grant. The plaintiff does not contend that the exclusive power conferred upon him to cross the river and land with passengers and property has been interfered with by another engaged in the same business; nor does he claim that his right to cross the river or land upon the shore has been challenged, but his position, as we understand it, is, that in consequence of the erection of a certain dike in a part of the river where he had the right to cross, the flow of the water has been changed, and in consequence of this change in the flow of the waters in the river, sand and ice accumulate in certain parts of the channel, which obstruct

33—91 Ill.

the landing of his boats in certain seasons of the year. It appears, from the evidence introduced by the defendant, that on the 3d day of March, 1871, an act of Congress was passed, the first section of which empowered the Louisiana and Missouri River Railroad Company, a corporation existing under the laws of the State of Missouri, to construct and maintain a bridge over the Mississippi river at the city of Louisiana. The second section provides, that the bridge shall be a lawful structure, and shall be recognized and known as a post route, upon which no higher rate shall be charged for the transmission over the same of the mails, the troops and the munitions of war of the United States, than the rate per mile for the transportation over the railroad or public highways leading to the bridge; and it shall enjoy the rights and privileges of other post roads in the United States.

The fifth section provides, that the structure shall be built and located under and subject to such regulations for the security of navigation of the river as the Secretary of War shall prescribe. See 16 U. S. Stat. at Large, 473.

On the 10th of May, 1873, application was made under the act, by the L. and M. Railroad Company, to the Secretary of War, for an approval of the location and plans for the bridge. A board of officers was appointed, and after an examination of the location and plan, a report was made approving of the location, but required the erection of the dike in question for the better improvement of the navigation of the river. The report was approved, and the bridge and dike erected in accordance with the report of the board and sanction of the Secretary of War. The bridge is but a connecting link uniting two great thoroughfares by rail from the east to the west.

These are the circumstances under which the dike was constructed in the river, which it is claimed violates the chartered rights of the plaintiff. The Mississippi river is a navigable stream of water, and while the plaintiff had the right, under the act of the legislature, to run his boats across it and land upon the shore, he had no right conferred upon him, nor

could the legislature give him any right, which would hinder or in any manner obstruct the free navigation of the river or impede the commerce of the country along or across the river.

Section 4 of the treaty between the King of Spain and the United States, made in 1795, provides, " That the navigation of the Mississippi river in its whole breadth, from its source to the ocean, shall be free only to his subjects and the citizens of the United States, unless he shall extend the privilege to the subjects of other powers by special convention." 8 U. S. Stat. at Large, 141.   And by the ordinance of 1787, it is provided, "That the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States and those of any other State that may be admitted into the confederacy, without any tax, impost, or duty therefor."

Reference is made to these provisions not so much for the purpose of showing that the navigation of the Mississippi river can not be obstructed, but rather to determine the object to be attained by the guaranty that the navigation of the river should remain forever free, and an appropriate answer to this will be found in what was said in *The People* v. *City of St. Louis,* 5 Gilman, 351, in these words: " The object to be attained was the promotion of commerce, and the rights secured are purely commercial."

Now, if the great object was to promote, facilitate and advance the commercial interests of the country, and if that object can be advanced by connecting two great thoroughfares by the erection of a bridge over which persons, property and the products of the country can be transported by rail,— is a great commercial enterprise of that character to be impeded or stopped for the reason some one may have a ferry franchise where the bridge is to be located, or is the power

vested in Congress to regulate commerce to be regarded as paramount?

The erection of a railroad bridge over a navigable stream in no manner conflicts with the guaranty that free navigation shall exist; but on the other hand the building of a bridge is in perfect harmony and entirely consistent with the free navigation of the river. In *The Illinois River Packet Company* v. *The Peoria Bridge Association*, 38 Ill. 467, which was an action brought to recover damages sustained by a boat, on the ground that a bridge was an obstruction of a navigable stream, it was held, that "The right to a free navigation of our western rivers, and the right of the State to provide means for crossing them by bridges or otherwise, are co-existent, and neither can be permitted to destroy or essentially impair the other." It was also held, that the authority to construct a bridge across a navigable stream wholly in this State should be exercised in such a manner that while it gives full effect to the power itself, it should interfere as little as possible with the right of free navigation. And this is the true test whether a particular structure is such an obstruction as is contrary to law.

In the case cited the bridge was erected across the Illinois river, a stream wholly within this State, while here, the bridge was built over a river which is a boundary line between two States, and built under the authority of an act of Congress; but this does not change the principle announced, that the right of free navigation, and the right to provide means for crossing by bridges, are co-existent.

Suppose Congress had passed an act to improve the river opposite Louisiana, for the purpose of facilitating navigation, and in making the improvement the current of the river was so changed that the place of landing for the ferry boats became so filled up with sand or drift as to render it practically impossible to use the landing, we apprehend it would not be claimed that damages could be recovered, and yet in principle

there is no substantial difference between the supposed case and the one under consideration.

The building of the dike, which changed the flow of water, and caused the accumulation of ice, sand and drift, was done under an act of Congress, enacted for the purpose of advancing the commercial interests of the country, and at the same time improving the navigation of the river.

In *South Carolina* v. *Georgia*, 3 Otto, 4, it was held, that the right to regulate commerce includes the right to regulate navigation, and hence to regulate and improve navigable rivers and ports on such rivers. It was also held, that Congress had power to close one of several channels, and to declare that an actual obstruction is not in view of the law an illegal one. It is there said, " It is not to be conceded that Congress has no power to order obstructions to be placed in the navigable waters of the United States, either to assist navigation or to change its direction, by forcing it into one channel of a river rather than the other." See also, case of *Clinton Bridge*, 10 Wall. 454. The question involved might be rested entirely on the case of *State of Pennsylvania* v. *The Wheeling and Belmont Bridge Company*, 18 Howard, 421, where it was held, that the power to regulate commerce includes the authority to license and authorize the erection of bridges across navigable streams, and to prescribe their height, location, and other circumstances affecting them relative to navigation.

The plaintiff in this case accepted the right to ferry across the river and land on the banks from the State, with the implied understanding that Congress might at any time, when the public good and commercial interests of the country required it, in the exercise of the power to regulate commerce, authorize a bridge to be erected, dikes to be placed in the river to change the current, and thus facilitate the navigation of the river, and although the plaintiff may have been somewhat damaged in his franchise, no action can be maintained for the recovery of such damages.

The act of the legislature of this State which established

the ferry gave the plaintiff no right or interest whatever in the flow of the river. The sole power to change the current of the river, when the commerce of the country demanded it, rested in Congress, and the legislature had no authority, if it had so desired, to confer upon the plaintiff any right to the use of the river which would prohibit the general government from authorizing the construction of bridges, dikes, or other improvements to meet the demands of the commercial interests of the country.

The judgment will be reversed, and the cause remanded.

*Judgment reversed.*