## JAMES OWEN

### v.

## THE VILLAGE OF BROOKPORT et al.

*Opinion filed February 17, 1904.*

1. DEDICATION—*effect where plat is not acknowledged according to statute.* An unacknowledged plat does not pass the fee of the streets to the municipality, but such fee, to the center of the street, attaches to the ownership of the abutting lots and is burdened with the easement of use in the public.

2. SAME—*effect where street in unacknowledged plat borders on a river.* When a street is indicated upon an unacknowledged plat as bordering upon a river, there being nothing to indicate its boundary line on the river side except the irregular line denoting the water's edge and no width being specified, the purchasers of abutting lots take the fee to the center of the stream, and, as to the original donor and his grantees, the street will extend to the water's edge.

3. PARTITION—*complainant must prove an undivided interest, as alleged in his bill.* A complainant in partition must show that he owns an undivided interest in the property sought to be partitioned, as alleged in his bill.

4. DEEDS—*when grantor cannot set up an after-acquired title.* Where a deed recites that the grantor owns the fee simple title and conveys the same with a covenant that the grantee shall hold the land free from all claims which may be made by the grantor or those claiming under him, the grantor and those claiming under him can not set up an alleged fee simple title subsequently acquired, but the same inures to the benefit of the grantee.

5. LEASES—*tenant cannot deny the validity of lessor's title.* One who recognizes the validity of a lease from a municipal corporation by accepting its provisions is estopped, during the continuance of the lease, to deny the validity of the title of the municipal corporation, even though he did not sign the lease.

6. LIMITATIONS—*statute does not run against municipal corporation.* The Statute of Limitations does not run against a municipal corporation with respect to streets or property held for public use.

APPEAL from the Circuit Court of Massac county; the Hon. A. K. VICKERS, Judge, presiding.

This is a bill for partition, filed in the circuit court of Massac county on March 11, 1902, by the appellant against the appellees for the partition of a piece of land

described in the bill as follows: "One-half of a tract or parcel of land, situated in the county of Massac and State of Illinois, in front of the town of Brooklyn and bounded as follows, viz.: Commencing at lot No. 1 and running to lot No. 30 in length, and commencing at low water mark and running up to First or Front street of said town in breadth, together with all and singular the buildings and improvements, rights, privileges, immunities and appurtenances, thereunto belonging or in anywise appertaining." The bill alleges that complainant below, appellant here, was ·the owner of an undivided half of this tract, and that the heirs and grantees of one James Campbell, deceased, are the owners of the other undivided half thereof. Among the defendants below were several minors, for whom guardians *ad litem* were appointed, and filed.answers. All the other defendants, except the village of Brookport and the Illinois Central Railroad Company, were defaulted. Answers were filed by the village and the railroad company, and replications were filed to such answers. The cause was referred to a master in chancery to take evidence, who reported back the evidence, oral and documentary.

On September 9, 1903, a decree was entered, dismissing appellant's bill of complaint, and taxing the costs of the defendants against the complainant. The present appeal is prosecuted from such decree of dismissal.

The bill alleges that the village of Brookport "claims or pretends to claim some right, title or interest in and to said tract or parcel of ground," and that the Illinois Central Railroad Company "claims some conditional right of easement or passageway over and through said tract or parcel of land by virtue of some resolution or ordinance of said village of Brookport," etc. In its answer the Illinois Central Railroad Company denied that the appellant, complainant below, had any title at all, or any right to bring suit for partition of the land described in the bill. It denied that Valentine Owen, the

father of appellant, was ever in possession of the land, as stated in the bill, and denied that any person or persons had any title or right to possession of said lands, except the village of Brookport and the Illinois Central Railroad Company. It alleged that the village of Brookport had the right of possession, except so far as it had granted the right of way to the railroad company to lay down its railroad tracks; and further alleged that the village, having the right to the possession and use of the said real estate, by its ordinances duly and regularly passed, gave to the railroad company the right to place its tracks on said land. In its answer the village of Brookport denied that Valentine Owen, the appellant's father, was ever at any time the owner in fee of an undivided half of the land, described in the bill, or was in possession of the land at any time, and denied that appellant had any interest in said premises, "except such as he holds as a licensee or lessee of the village of Brookport." It further alleged that the village is the owner of said premises, and denies that appellant is entitled to partition of the same.

Appellant here, complainant below, introduced in evidence a map of Brooklyn, which is conceded to be now the village of Brookport, showing that said village or town was laid out upon the order of C. Pell in August, 1850, which plat was filed for record on September 28, 1850. The plat shows a division of the ground, upon which the town or village is located, into streets, blocks, and lots, which ground is situated upon the north, or Illinois, side of the Ohio river. The southernmost street in the town, running east and west, is designated upon the map as "Water street." The map or plat does not give any figure or figures, showing the width of Water street; but, on the south side of the space marked Water street, is a meandering line intended to designate the north bank of the Ohio river. On the north side of Water street are located certain blocks numbered 1, 2, 3, 4 and 5, No. 1

being the west block and No. 5 the east block. Each of these blocks is divided into six lots. All the lots front south upon Water street, which runs from west to east. The westernmost lot in block 1 is numbered lot 1, and the easternmost lot in block 5 is numbered lot 30. On the west side of block 1 Davis street runs from Market street on the north to Water street on the south; between blocks 1 and 2 Metropolis street runs from Market street on the north to Water street on the south; between blocks 2 and 3 Crocket street runs from Market street on the north to Water street on the south; between blocks 3 and 4 Ferry street runs from Market street on the north to Water street on the south; between blocks 4 and 5 Ohio street runs from Market street on the north to Water street on the south. East of block 5 is a street designated as George street. Market street, which runs east and west, and on the north side of blocks 1, 2, 3, 4 and 5, is just south of blocks 8, 7 and 6, and there are no figures on the map to indicate its width. Elizabeth street runs east and west north of blocks 8, 7 and 6, but there are no figures to designate its width.

CAMPBELL & CAMPBELL, and S. BARTLETT KERR, for appellant.

C. L. V. MULKEY, W. W. BARR, and COURTNEY & HELM, (J. M. DICKINSON, of counsel,) for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The property in controversy in this case is the levee, or water front, in Brookport, Illinois, and comprises the sloping bank of the Ohio river, situated in front of the town. The proof tends to show that at times the Ohio river rises, so that the north line of the river upon the river front of Brooklyn shifts; in time of high water it is further north than in time of low water. The space of ground between the tier of lots, commencing at lot No. 1

and running to lot No. 30—which front to the south upon the north side of Water street—and the low-water mark of the river has no other designation upon the map than "Water street." Water street is the first street back from the Ohio river, on the north bank of which the town is located. It is the street that runs up and down the river immediately south of and in front of the first tier of town lots and blocks, as designated on the plat. Whether or not Water street embraces the whole of the space between this tier of lots and the river is one of the disputed points in the case. In other words, the main issue is the location of the south boundary line of Water street; that is to say, whether the boundary line is on top of the bank, as it is called in the arguments of counsel, or at the foot of the bank. The strip of ground in controversy is about 1600 feet long and varies in width from 100 feet to 150 feet.

*First*—The plat, which was made in August, 1850, and recorded on September 28, 1850, was not acknowledged, as required by the statute, and, therefore, there was no statutory dedication, by the making and recording of the plat, of the land embraced within the streets designated thereon. But there was here a common law dedication of such land. If the plat or map had been made in accordance with the statute, and properly acknowledged and recorded, so that it would operate as a statutory dedication, the fee in the streets, or land dedicated, would have been vested in the corporation in trust for the public. But the plat, not having been acknowledged in conformity with the statute, so that it operated as a common law dedication only, the title to the streets vested in the adjoining owners subject to the easement of the public; and the title of the adjoining owners would extend to the center of the street. (*Sanitary District of Chicago* v. *Adam*, 179 Ill. 406; *Matthiessen & Hegeler Zinc Co.* v. *City of LaSalle*, 117 id. 411; *Village of Vermont* v. *Miller*, 161 id. 210; *Jordan* v. *City of Chenoa*, 166 id. 530.)

In *Thompson* v. *Maloney*, 199 Ill. 276, we said (p. 282): "In such cases the title to the streets, alleys, etc., is in the owner of the tract platted, and there remains so long as he retains the ownership of all the lots shown on the plat. If, however, he sells a lot, describing it in the deed by reference to the plat, the title to the soil of the street in front of the lot to the center of the street by operation of law attaches to the fee of the lot, and the proprietor of the plat ceases to be the owner in fee of such portion of the street." The proof shows that, about the time the plat was made, Charles Pell was the owner of the ground platted, either alone, or as tenant in common with one Thomas G. C. Davis. It is stipulated between the parties that Charles Pell in his lifetime conveyed lots, fronting on Water street, with reference to the plat offered in evidence, describing some of them, as fronting on Water street, and others by simply calling the lot and block. It appears from the testimony in the case that the lots, fronting south on Water street, are owned by different parties, and that houses have been erected upon many of them. It follows that the title to the soil of Water street in front of the tier of lots abutting thereon, as above described, to the center of that street would attach by law to the fee of the lots. Necessarily, therefore, Charles Pell, the proprietor and maker of the plat, ceased to be the owner in fee of Water street to the center thereof in front of the lots in question. In *Clark* v. *McCormick*, 174 Ill. 164, we said (p. 174): "Each purchaser of a block in the subdivision is presumed to have bought in view of the system of streets and ways, designed by the proprietor of the plat to provide means of ingress and egress to and from all parts of the platted ground, not only for the use of the owners and occupants of the lots or blocks, but of all who might desire to pass along such streets and ways. The arrangement of streets and ways formed a part of the consideration of the purchase of each block or part thereof, not only as between the

original proprietor of the plat and those who purchase from him, but also as between all subsequent vendors and vendees. The original proprietor sold to his vendee the rights and privileges of the streets, and each subsequent vendor passed such rights to his vendee. The law implies mutual agreements between all such parties that the streets shall always remain open for use as platted. * * * The fee to the strips in question is attached to the fee in the blocks, upon which the streets abut, and rests in the owners of such blocks. It is not a title vesting in the owners of the blocks the ownership of the strips as separate, independent property, which may be detached from and sold distinct from the blocks, but it passes to any subsequent holder of the blocks."

In *Davenport Bridge Railway Co.* v. *Johnson*, 188 Ill. 472, we held that, where a plat is not authenticated as required by law, the fee to the streets does not pass to the municipality, but that the execution and recording of the plat operates as a conveyance to the abutting lot owners of the fee of the street to the center thereof, and that this fee attaches to the ownership of the lots and passes with each conveyance of the lots, and is burdened with the easement of use in the public.

An acceptance is necessary to make a complete dedication under the statute, and, until acceptance, the fee does not vest in the municipality, but remains in the original proprietor. Such a conveyance of the lots before acceptance carries the title to the center of the street. (*Hamilton* v. *Chicago, Burlington and Quincy Railroad Co.* 124 Ill. 235; *Littler* v. *City of Lincoln*, 106 id. 353).

By an act of the legislature, entitled "An act to incorporate the town of Brooklyn, Massac county, State of Illinois," approved February 18, 1855, the town of Brooklyn was incorporated by the name and style of "The President and Board of Trustees of the Town of Brooklyn;" and, by section 2 of said act, the boundary of said corporation was made to commence at the water's edge op-

posite the lower town boundary on the Ohio river. "No particular form is requisite to the validity of a dedication. It is purely a question of intention. A dedication may be made by a survey and plat alone, without any declaration either oral or on the plat, when it is evident from the face of the plat, that it was the intention of the proprietor, to set apart certain grounds for the use of the public." (*Maywood Co.* v. *Village of Maywood*, 118 Ill. 61, and cases there referred to.) There are many circumstances to indicate that, when the town of Brooklyn was laid out, it was the intention of Charles Pell, or of Charles Pell and Thomas G. C. Davis, that Water street should extend in width to the water's edge, and that the whole of the space between the tier of lots fronting on Water street and the river was intended to be dedicated as a street. There is nothing on the plat to indicate what the width of Water street is, and upon its face the plat would seem to show that Water street lies between the northern tier of lots abutting thereon and the low water mark of the river, or the meandering line upon the south side of the space marked Water street, intended to designate the northern bank of the Ohio river. Market street and Elizabeth street running east and west and parallel with Water street, have no figures indicating their width, but lie between the lot or block lines upon the north and south sides of said streets. If the width of Market street and Elizabeth street is to be regarded as the distance between the north line and the south line bounding those streets, then it would appear that the width of Water street would be the distance between the north line and the south line between which Water street lies, and the lines, as indicated upon the map, between which water street lies, are evidently the north tier of lots and the bank of the river, the latter being designated by a meandering line upon the south side of Water street. It is conceded by both parties that the town of Brooklyn, including the land here in controversy, was a

part of the fractional south half of section 14, etc., con-
taining 76.96 acres.   This fractional south half of sec-
tion 14 was listed for taxation, and taxes were paid on
it before Brooklyn was platted, but, after the plat was
made, there is no record, showing that the land, lying
in front of Brookport, was listed for taxation, or that
any taxes were paid thereon.   If the original owners
of this ground intended to retain the ownership of it,
they would have listed it for taxation after the town was
platted, as they did before the town was platted.   Water
street is of varying width, differing in that respect from
the other streets shown by the plat, and its south bound-
ary line is not a straight line but a wavy, irregular line
in imitation of the meanderings of a stream, evidently
showing that it was the intention that the street should
extend to the water's edge.   The plat does not show any
reservation of ground in front of the town, and the very
name of the street, which is not First street or Front
street as stated in the bill, but Water street, would im-
ply that the street was meant to border upon the river,
or a body of water.   In addition to all this, the town was
laid out and located upon the bank of a navigable river,
and such location would seem to indicate an intention
that the inhabitants of the town should have free access
to the river.   All these facts show an intention on the
part of the dedicators, that Water street should extend
to the river.

   When the street was thus dedicated as a public high-
way, an easement therein arose in favor of the public,
and afterwards in 1855, when the town was incorporated
by an act of the legislature, the right to control the
street passed to the corporate authorities, as represen-
tatives of the inhabitants of the town.   (*Maywood Co.* v.
*Village of Maywood*, 118 Ill. 61.)   After the dedication of
the street, Pell and Davis divided the lots bordering up-
on the street between themselves, and then sold said lots
with reference to Water street, and thereby Water street

became so dedicated as to be forever open to the use of the public, as a public highway, free from all claim or interference of the proprietor, or those claiming under him, inconsistent with such use; and Pell and his grantees were thereby perpetually estopped from denying the existence of the street. (*Russell* v. *City of Lincoln*, 200 Ill. 511).

There is evidence in the record showing an acceptance of the dedication thus made. "The acceptance may be an express one, evidenced by some formal act of the public authorities, or it may be one implied from their acts, such as repairing, improving, lighting or otherwise assuming control of the lands dedicated, or it may be implied from user by the public for the purposes for which it is dedicated. * . * * When the dedication is beneficial or greatly convenient or necessary to the public, an acceptance will be implied from slight circumstances." (*Alden Coal Co.* v. *Challis*, 200 Ill. 222). In the case at bar, the evidence shows that in 1860 and 1861 the town of Brooklyn had a marshal, and was acting under its charter, and that there were three traveled roads on Water street all leading down to the river, which were kept in repair by the town authorities. Again, in 1889, the municipal authorities of Brooklyn, or Brookport, graded and graveled the ground in controversy, putting in $400.00 or $500.00 worth of work there. It would appear that the town was subsequently incorporated under the general Incorporation act, and since that time the village authorities have exercised control over this river front. They granted track privileges over it to the Illinois Central railroad, and wharf privileges to certain persons, and ferry privileges to the appellant himself and his brothers, as will be hereafter shown. The proof tends to show that this property here in controversy has been traveled by the public, and used uninterruptedly as a common highway, for some fifty years. There can be no other conclusion, therefore, than that there was an acceptance of the dedication by the municipality.

In what has been said above as to the extension of the ownership to the center of the street, reference has been had to the ordinary street without reference to its location on a stream or river. Here, however, Water street, being located upon the river, the street extends to the middle of the river. On the plat the southern line of Water street along the river is an irregular, wavy line, depending upon the meanderings of the river and indicating the river as a boundary. "Grants of land bounded on rivers or upon their margins, above tide water, carry the exclusive right and title of the grantee to the center of the stream, unless the terms of the grant clearly denote the intention to stop at the edge of the river." (*Davenport Bridge Railway Co.* v. *Johnson, supra*). In *Village of Brooklyn* v. *Smith*, 104 Ill. 429, it was held that a street bounded upon a navigable stream, above high-water mark, like a grant so bounded, will extend to the center of the stream, unless an intention is clearly shown in the grant or act, laying out the street, to stop at the edge of the river; and that, where a street of an incorporated village, situate upon the bank of the Mississippi river, extends to the center of the stream, the fee of the street is in the corporation for the benefit of the lot owners and the public, and the village authorities may properly interpose to prevent an intruder from cutting and removing ice, which may have formed upon such street; and in that case we said (p. 436): "Here is a town laid out upon the bank of a navigable river, with Water street in front of the town between it and the river, and the idea of the street not extending to the river seems preposterous. Of what use to the proprietors would be the reservation to them of anything between the street and the river, and what a lessening of the value of a town site upon a navigable stream would be the absence of a public landing? It must be supposed that such a town is laid out with reference to the use and enjoyment of the river. A public landing would be

viewed as a thing of prime interest, which would be an element of value pertaining to every town lot which was to be sold. As was said by this court in a similar case, (*Godfrey* v. *City of Alton,* 12 Ill. 29): 'This stream is a public highway. In contact with this another easement is granted, and the very location of it shows it was designed for the purpose of lading and unlading freight and landing passengers from the water communication, as much as the laying out of an interior street would show it was designed for the use of travelers by land.' The western line of Water street, as marked upon the original plat, is not a straight line, but an irregular, wavy line, denoting, as we take it, the meandering of the river, and thus indicating the river to be the boundary."

In view of what has been said, and of the authorities referred to, it seems to follow, as a necessary conclusion, that the original proprietor, who made this plat, divested himself of all right or title to the land lying between the northern tier of lots and the bank of the river; and, as appellant holds under the original proprietor, Charles Pell, he could not have obtained any title to this strip from Pell. Having begun a partition suit, appellant must show that he owned an undivided interest in the property sought to be partitioned, as alleged in his bill. He seeks to establish a paramount fee simple title to the strip here in controversy under a deed, executed by Pell in 1870. If the views thus far expressed are correct, then the title to that strip, either to the center of the river, or, certainly, to the edge of the river, was vested by dedication and acceptance in the village of Brookport, and, therefore, in 1870 Charles Pell had no title when he made the deed to Valentine Owen, appellant's father.

*Second*—But for other reasons, we are of the opinion that appellant had no title to any of the property here in controversy, aside from the question of dedication. On December 22, 1870, Charles Pell and wife executed to

Valentine Owen a deed, dated December 22, 1870, convey-
ing to Valentine Owen, the father of appellant, an undi-
vided one-half of the premises, sought to be partitioned,
as described in the bill.  Valentine Owen died intestate
in 1872, leaving certain heirs of whom the appellant is
one.  Since then, appellant has obtained deeds from the
other heirs, so that he is the holder of whatever title,
if any, was in Valentine Owen at the time of his death.
But Valentine Owen had no title at that time, because
his grantor, Charles Pell, had, prior to December 22, 1870,
parted with all the interest he had in the south half of
fractional section 14.

Prior to September 17, 1851, Charles Pell and Thomas
G. C. Davis appear to have been the owners of the south
half of fractional section 14, each owning an undivided
one-half thereof.  On September 17, 1851, a partition deed
was made between Charles Pell and Thomas G. C. Davis
in pursuance of a contract for partition previously made
on July 4, 1851.  Prior to that, to-wit, on February 8,
1851, the legislature of Illinois passed an act, granting
to Charles Pell and Thomas G. C. Davis a ferry franchise
from Brooklyn, Illinois, to the Kentucky shore for the
term of fifty years with right to land a ferry boat at any
point on the Ohio river between lot 1 and lot 30 in Brook-
lyn, Illinois.  The partition deed of September 17, 1851,
recites that Pell and Davis are seized of and hold in fee,
as tenants in common, the south half of fractional sec-
tion 14, containing 76.96 acres, and that they have laid
off and established a town, known and called by the name
of Brooklyn; and, by the terms of the partition deed,
Pell deeds to Davis, his heirs and assigns, "all that part
of said tract of land situated, lying and being west, be-
low and adjoining said town of Brooklyn, and * * *
also" certain lots in the town of Brooklyn, "and all the
said Charles Pell's and the said Priscilla Pell, his wife's,
right, title and interest in and thereto, to have and to
hold the same to him, the said Thomas G. C. Davis, his

heirs·and assigns, and to his and their use and behoof forever." The deed contains the following covenant: "And the said Charles Pell, for himself and his executor and administrator, does covenant with the said Thomas G. C. Davis, his heirs and assigns, that he and they shall and may forever hereafter have, hold, occupy, possess and enjoy the said part of said tract of land, and said town lots hereby assigned to the said Thomas G. C. Davis, free and discharged of and from all claims and demands thereto to be made by the said Charles Pell or his assigns, and all persons claiming under him or them." The words in the deed, "all that part of said tract of land situated, lying and being west, below, and adjoining said town of Brooklyn," include the property here in controversy, if such property is not embraced in Water street, and lies south thereof and between Water street and the river. The strip here in controversy, if not embraced in Water street, must be "below and adjoining said town of Brooklyn." If, therefore,·there was a space of ground south of Water street and between the river and said street, which was not embraced in that street, it passed from Pell to Davis by the partition deed of September 17, 1851. It is true that, when the deed of September 17, 1851, was executed, Pell must have had merely an equitable title, as the record does not show that he had the legal title, but appellant introduced in evidence a deed from John T. Madden and wife to Charles Pell, dated December 16, 1851, conveying to Pell the south half of fractional section 14; and the chain of conveyances shows title thereto from the government down to Madden. We are of the opinion that the title, subsequently acquired by Pell on December 16, 1851, inured to the benefit of Davis, his grantee in the partition deed. That deed recites upon its face that Pell, owned a fee simple title, and it conveys that title and the land itself, as well as his interest in the land, and it also contains a covenant that Davis shall hold the land, deeded to him, free and dis-

charged from all claims and demands that may be made in the future by Charles Pell, or his assigns, and all persons claiming under him or them. Surely, under this covenant and in view of the fact that the deed passes a fee simple title, Pell could not set up against Davis the after acquired title, conveyed to him by the deed of December 16, 1851. (Rev. Stat. chap. 30, sec. 7; 1 Starr & Curt. Ann. Stat.—2d ed.—p. 918; *Holbrook* v. *Debo*, 99 Ill. 372; *Bowen* v. *McCarthy*, 127 id. 17; *Guertin* v. *Mombleau*, 144 id. 32).

Subsequently, on February 16, 1854, Pell conveyed to James Campbell all his remaining interest in the south half of fractional section 14, and also in the same deed conveyed to Campbell the undivided half of the ferry privileges owned by Pell, the other undivided half of which privileges had been granted to Thomas G. C. Davis.

We are, therefore, of the opinion that, if the title of Pell to this strip of land here in controversy did not pass to the village of Brookport by dedication, it was conveyed away by Pell to Davis and Campbell long before December 22, 1870; and, therefore, no interest passed from Pell to Valentine Owen by the deed, executed on December 22, 1870.

*Third*—But appellant claims that, if he did not obtain paramount title through the deed from Pell to his father, Valentine Owen, yet that that deed, conveying an undivided one-half of the premises in question, was good color of title, and that, under the same as such claim and color of title, Valentine Owen, appellant's father, and appellant, and his brothers, held adverse possession of the strip in question for a period of twenty years, and more. The only evidence of possession introduced is that Valentine Owen, and appellant and his brothers, ran a ferry boat from the Kentucky side of the river to the village of Brookport, and landed their ferry boat at the landing or wharf upon the strip of land in question. They had a float, which they attached by stakes to the ground, in order that passengers and freight, coming

down from Brookport, might the more easily reach the
ferry boat. This float was movable, and its position
was changed as the water in the river rose or fell. It
was situated further up the bank in time of high water,
and further down the bank in time of low water. Its
location appears to have been opposite block 3 between
Ferry and Crocket streets. It appears that other boats
than the ferry boat of Valentine Owen and his sons
landed upon this river front. It is a serious question
whether the mere fact, that the ferry boat landed upon
this river front and that the owners of the ferry boat
used upon the bank a movable float, attached to the bank
by stakes for the purpose of more easily taking on freight
and passengers upon the ferry boat, really constituted
such adverse possession as is required by the law. In
*Mississippi River Bridge Co.* v. *Lonergan,* 91 Ill. 508, it.was
held that the landing of a ferry boat along the shore at
such places, as might from time to time be most suitable
or convenient, did not constitute adverse possession.

But the evidence shows that, after the village of
Brookport had passed an ordinance, granting to the Illi-
nois Central Railroad Company the right to lay down
their tracks upon this strip of ground here in contro-
versy, appellant, or one of his brothers under whom he
holds, applied to the village of Brookport for the privi-
lege of landing his ferry boat at the landing in question.
In pursuance of his application so made, a lease was ex-
ecuted by the town of Brookport in the year 1891, leas-
ing to one of appellant's brothers, who was appellant's
grantor, for the term of fifteen years the privilege of
landing his ferry boat at this landing. The proof tends
to show that the appellant himself was the agent of his
brother in negotiating this lease from the town; and, as
we understand the evidence, it is not denied on the part
of appellant that the landing was thus leased by his
brother from the village. By taking this lease appel-
lant, or his grantor, admitted that the village of Brook-

port had title to the landing in question.  When the president of the board of trustees of the village executed this lease, a record of it was made upon the records of the municipality, and the record book, showing the execution of the lease in 1891, was introduced in evidence. It is said that, while this lease was made by the village through the president of its board of trustees, yet the same was not signed by appellant, or by his brothers, Robert Owen, or Henry Owen.  But the evidence is quite clear that, after the execution of this lease, appellant himself and his grantor ran the ferry boat and landed it in pursuance of the lease, and in recognition of the authority of the village to control the use of the premises here in question.  As this lease was to run for fifteen years from 1891, it has not yet expired.  During the existence of the tenancy appellant is estopped from disputing the title of his lessor, the village of Brookport. A tenant is never permitted to deny the validity of the title of any one from whom he has accepted a lease.  If the lease was made to one of his brothers, yet, as he is grantee of his brother, he is equally bound by the estoppel, as was the original lessee. (*Tilghman & West* v. *Little*, 13 Ill. 239; *Alsup* v. *Stewart*, 194 id. 595; *Carter* v. *Marshall*, 72 id. 609; *Fleming* v. *Mills*, 182 id. 464).

In what has been said it has been assumed that the Statute of Limitations in regard to adverse possession for a period of twenty years can run against the village of Brookport.  The general rule, however, is that the Statute of Limitations does not run against a municipal corporation in respect to streets or property, held for public use; and that an adverse possession of such property, no matter how long continued, is of no effect. (*Shirk* v. *City of Chicago*, 195 Ill. 298; *City of Sullivan* v. *Tichenor*, 179 id. 97; *Russell* v. *City of Lincoln*, 200 id. 511; *Catlett* v. *People*, 151 id. 16).

In any view, which we can take of this case, we are forced to hold that appellant was not the owner of an

undivided one-half of the property, sought to be parti-
tioned, and, therefore, was not entitled to a decree for
partition.   The controversy here is not between the ap-
pellant, claiming to own one undivided half and the
heirs and grantees of James Campbell, alleged to be the
owners of the other undivided one-half.   The heirs and
grantees of Campbell have been defaulted, and make no
contest.   The contest here is between appellant on the
one side and the village of Brookport and the Illinois
Central Railroad Company on the other, the latter claim-
ing the right to use its tracks, laid down upon the strip
of ground in question, under an ordinance passed by the
village.

We are of the opinion that the court below correctly
decided, that appellant had no interest in the property
except as lessee or licensee of the village, and committed
no error in rendering a decree dismissing the bill.

Accordingly, the decree of the circuit court is affirmed.

*Decree affirmed.*