## Case No. 17,147.

### WARD et al. v. The A. ROSSITER.

[6 McLean, 63;[1] Newb. 225.]

.Circuit Court, D. Illinois. Oct. Term, 1853.

COLLISION—STEAMER ENTERING HARBOR AT NIGHT—EXCESSIVE SPEED.

1. A steamer, in entering the harbor of Chicago in the night, at a speed of three and a half to four miles an hour, while another steamer was in the act of turning, just above a bend in the river, came in collision with the latter, at that moment lying across the river. The former was in fault, and was liable for the damages done. The river was full of craft, and the speed of the steamer was too great under the circumstances.

[Cited in The Blackstone, Case No. 1,473; The Free State, Id. 5,090; The Nacoochee, 28 Fed. 467.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

2. If a steamer, owing to any cause, cannot see its way clear before it, in entering a harbor in the night, it is its duty to stop.

[Cited in Illinois River Packet Co. v. Peoria Bridge Ass'n, 38 Ill. 476.]

[This was a libel by Eber B. Ward and Samuel Ward against the propeller A. Rossiter.]

Mr. Shumway, for libellant.
Mr. Goodrich, for claimant.

DRUMMOND, District Judge. On the 27th of August, 1851, the steamer St. Louis had returned from her nightly trip from New Buffalo to Chicago, and had entered the river and passed a little above her wharf to wind. It was about three o'clock in the morning. There was no regular place at that time for steamers to turn. They winded where they could, though there was a place—the excavation—where it was more convenient and wider than at other places. The St. Louis was in the act of turning, lying across the river (then two hundred and six feet wide only at that place, the St. Louis being one hundred and ninety-five feet long), when the Rossiter came into the harbor at a speed of three and a half to four miles an hour. In turning the bend of the river, not far from the ferry, a little more than seven hundred feet from the spot where the St. Louis was winding, the Rossiter encountered a thick smoke, coming across the river from the ruins of Haddock & Norton's warehouse, then recently destroyed by fire, which prevented those on board, as they allege, from seeing the St. Louis, though the people of the latter assert that they could easily distinguish the Rossiter. The Rossiter blew her whistle as she came up the river. The St. Louis had all necessary lights. The Rossiter was hailed as she approached, but without avail, as she immediately struck the St. Louis and caused damage to the amount of $258.61. It was a clear star-light night. These are the material facts in the case.

There can be no doubt that the Rossiter was in fault, and liable for the injury done. If those on board of the propeller could not see their way clear, owing to the smoke, it was their duty to proceed with extreme caution, especially as they were approaching a bend in the river. It is a rule of universal application, that a steamer in entering a harbor at night, crowded with craft as the Chicago river was at that time, shall be held to the greatest diligence and circumspection, and if owing to fog, smoke, or other cause, they cannot see their way before them, it is their duty to stop, or at least proceed with such slowness that they can stop at a moment's notice. It will not do for steamers to proceed at haphazard, and trust to chance to go clear. If they cannot see the way they must stop till they can. I have repeatedly been called upon to investigate cases which have originated from the recklessness with which steamers enter the harbor of Chicago, as well in the daytime as in the night. They must be more careful and

vigilant than they have been, or, clearly understood, they will have to answer in damages for the consequences. A decree will be entered against the claimant and his sureties for the sum of $258.61 and costs.