| 38  467|
| 139  66|
| 38  467|
|155  473|

THE ILLINOIS RIVER PACKET COMPANY

*v.*

THE PEORIA BRIDGE ASSOCIATION.

1. PLEADING AND EVIDENCE. If facts are well alleged in a declaration, they may be proven.

2. In an action by the owners of a steamboat navigating the Illinois river against the owners of a bridge over that stream, to recover for injury

to the boat resulting from a collision with the bridge, it is a proper pleading of the fact to allege that the bridge materially obstructed the navigation of the river; and it is competent to ask a witness, an experienced river man, whether the bridge was a material obstruction to the navigation of the river.

3. EVIDENCE—*what are facts, to be proven, as distinguished from matters calling for the opinions of experts.* The proving that the bridge was a material obstruction to the navigation of the river, is not like the testimony of experts, or of scientific men, whose opinions are sought on facts supposed, or proved, but it is testimony to the existence of the fact itself.

4. RIGHTS OF PARTIES ARE MUTUAL—*application of rules of evidence.* As a general principle, rules of evidence are designed as well for defendants as for plaintiffs, and must be applied to them, respectively, in the same spirit of impartiality.

5. So where the court allowed a witness to answer a question propounded by the defendant, which was of the same character it had previously refused to allow to be answered when asked by the plaintiff, the unequal application of the rule was held to be error.

6. NAVIGABLE STREAMS—*erection of bridges across them—of the relative rights in respect thereto.* It can not be said that the navigation of the Illinois river is of most importance and paramount to all conflicting rights, and that no one has any right to erect a bridge across the same, if it in the least materially obstructs its free navigation.

7. The true doctrine is, that conceding the right of the State to authorize building bridges over the navigable waters lying within its jurisdiction, such structures should be so erected, as to interfere as little as possible with the right of free navigation.

8. And if it appears that a bridge is of the most approved construction, and sufficient way left for the passage of boats in ordinary conditions of the wind and stages of the water, those navigating them, at the same time, using proper care and caution, it shall not be averred of such bridge that it materially obstructs the navigation of the river.

9. If the wind and water are unpropitious to an attempt to pass through the draw, then ordinary caution would require the vessel to stop, until the danger has passed.

10. The right to a free navigation of our western rivers, and the right of the State to provide means for crossing them by bridges or otherwise, are co-existent, and neither can be permitted to destroy or essentially impair the other.

11. The authority to construct a bridge across a navigable water wholly in this State, should be exercised in such a manner, as, while it gives full

effect to the power itself, it should interfere as little as possible with the right of free navigation ; and this is the true test whether a particular structure is such an obstruction as is contrary to law.

12.  A bridge constructed on the most approved plan, at the proper place and with sufficient channel between the piers, over any of our navigable waters, can not, under any circumstances, be held to be a material obstruction to the navigation, if it appear, that in ordinary times, with ordinary wind and water, the draw can be safely passed, and that no better structure could be erected for the purpose designed, with the amount of outlay demanded for such undertakings.

13.  If on reaching one of these bridges the vessel should be overtaken by an unfavorable wind, or by any circumstance, that would render some delay prudent, the delay must be incurred, for the right to erect the bridge is co-extensive with the right to navigate the river.

14.  A mere delay in passing a bridge, which prudence would advise at unpropitious moments, when wind and currents are not favorable, can not affix to it the quality of a material obstruction, or of any other description of obstruction, for the erection of which the owners should be liable in damages.

15.  NAVIGABLE WATERS—*effect of ordinance of* 1787.  There is no restriction in this ordinance, if it be still in force, on the power of the State to use the most approved artificial means for crossing navigable waters within the State ; it only prohibits their obstruction, and the imposition of any tax or duty on their navigation.

16.  The ordinance, in declaring certain navigable waters shall be common highways and forever free, without any tax, impost or duty therefor, does not mean that they shall be common highways free from all and every condition, but only that they shall be free from obstruction, and free from any burden imposed in the shape of a duty or tax.

17.  EVIDENCE--*under the general issue.*  In an action by the owners of a steamboat navigating a river, against a company owning a bridge erected across the same, to recover for damages resulting from a collision with the bridge, the act of the Legislature authorizing the bridge to be built is admissible in evidence under the general issue.

18.  SAME—*admissibility, generally.*  It is not a valid objection to such testimony that it might mislead the jury into the idea that the act afforded a complete defense to the action ; the opposite party could obviate any improper effect the testimony might be supposed to have, by requiring of the court specific instructions as to the effect to be given to the act.

WRIT OF ERROR to the Circuit Court of Peoria County; the Hon. MARION WILLIAMSON, Judge, presiding.

The case is sufficiently stated in the opinion of the Court.

Messrs. INGERSOLLS and PUTERBAUGH, for the plaintiff in error.

Mr. H. GROVE and Mr. E. N. POWELL, for the defendant in error.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action of trespass on the case brought in the Peoria Circuit Court by the plaintiff in error against the defendant in error, to recover damages for an injury done to the steam boat "Sam Gaty," owned by the plaintiff, and alleged to have been caused by the defendant's bridge across the Illinois river at Peoria.

There was a trial and verdict and judgment for the defendants, and the cause brought here by writ of error and many errors assigned, all which it is not necessary to notice, as the case can be disposed of, on certain rulings of the court on portions of evidence offered by the plaintiff, and embraced in the first nine errors assigned and the instructions.

The declaration charged that the defendants had, before the injury complained of, constructed and were then in possession of a certain bridge and piles across the Illinois river which materially obstructed the navigation of the river.

A demurrer to the declaration had been overruled, and the declaration adjudged good. Among the causes of demurrer was the following: The declaration does not show how the defendant obstructed the navigation of the river, nor does it state with sufficient certainty where or when the piles, bridge, etc., were built, nor in what direction, nor the extent of the obstruction. Adjudging the declaration good, opened the door of inquiry the plaintiffs sought to enter by the excluded testimony of nine witnesses, at the head of whom was Capt. Scott,

an Illinois river steam boat man of fourteen years' experience. He, as also the other eight witnesses, were asked by the plaintiff whether the defendant's bridge was a material obstruction to the navigation of the river.    The court would not permit the witness to answer the question.

All these witnesses were well acquainted with the Illinois river and its channel, two of them before the bridge was built and since, and some of them officers of the steam boat at the time of the accident.

The declaration having been adjudged good and sufficient, the court in arriving at that conclusion, must have determined that it alleged facts only, otherwise, it would be bad on demurrer.    This being so, what were the prominent facts alleged in the declaration ?    First, that the Illinois river was a navigable water leading into the Mississippi river, and, as such, a common highway free to the plaintiff and all citizens of the United States.  Second, that the plaintiff was an incorporated company, and owner of, and navigating this river with their steam boat. Third, that the defendants had, before that time, constructed and were in possession of a bridge over this river.    Fourth, that this bridge materially obstructed the navigation thereof. Fifth, that plaintiff, while navigating this river with his steam boat, with ordinary care, came in contact with this bridge, and was greatly damaged and delayed.

These facts, thus alleged, in the judgment of the court, made a good declaration.    Then, the question is, if facts are well alleged in a declaration, can they not be proved ?    Was it not competent for the plaintiff to prove the fact that the Illinois river was a navigable water leading into the Mississippi river, and, as such, a common highway ?    Was it not competent to prove that the plaintiff was an incorporated company, and owner of, and navigating this river with their steam boat ? That the defendants had constructed this bridge ?    That the bridge materially obstructed the navigation of the river ?  and that the plaintiff was running the boat at the time of the injury, with ordinary care ?

These are all facts well pleaded, in the declaration, so the court said in overruling the demurrer. Why then they shall not be proved is not perceived. The charge is, that the erection of the bridge materially obstructed the navigation of the river. The inquiry then is, as to a material obstruction. That is the fact charged. What better proof could be desired than the testimony of experienced river men, to prove the fact charged? It does not appear to us like the testimony of experts, or of scientific men, whose opinions are sought on facts supposed, or proved, but it is testimony to the existence of the fact itself—a material obstruction to the navigation of the river caused by the bridge. A direct, answer yes or no, could be given to the question; it is a question of fact alone, as the court had already determined by holding the declaration to be good. Can not a surgeon be asked on a trial for murder, was this a mortal wound? Can not a fabricator of steam engines be asked, if the alleged injury was caused by breaking the piston rod, if the rod was sound or defective? We are at a loss to perceive wherein the question to these witnesses, on this point, was objectionable.

Another objection is that the court adopted a rule which was not applied to both the parties litigating. On the cross-examination of John Hamlin, a witness introduced by the defendant, the court, on the objection of the defendant, would not permit the witness to answer this question propounded by the plaintiff, " Does not the bridge, when there is a strong wind, high water and swift current, add to the dangers and difficulties of navigation?" While at the same time, the defendant, on the examination of another witness, Samuel Tart, the toll collector on the bridge, was permitted to ask, against the plaintiff's objection, and the witness was permitted to answer this question, he, Tart, stating, at the same time, that he never was on a boat in any capacity—was not a pilot—never steered a boat an inch in his life—knew nothing about navigation theoretically or practically : "Was there anything in the wind, stage of water, or current at the bridge on

the evening of March 31, 1859, to prevent the Sam Gaty passing through the bridge, without being injured, had she been properly managed?" And the other question this witness was allowed to answer against the objection of the plaintiff: "State whether the wind was blowing enough to prevent a boat passing through safely during the time you were absent?" As a general principle, rules of evidence are designed as well for defendants as for plaintiffs, and must be applied to them respectively in the same spirit of impartiality. We see nothing in this case to take it out of the reach of this principle. This ruling, manifestly the result of inadvertence on the part of the court, was an error and might have prejudiced the plaintiff's case. For these errors the judgment must be reversed and the cause remanded.

The plaintiff further complains the court erred in refusing to give the eleventh and twelfth instructions asked by the plaintiff. They are as follows:

11. The court instructs the jury that the navigation of the Illinois river being of most importance to the public weal is paramount to all conflicting rights, and no one has any right to erect a bridge across said river, if it in the least materially obstructs the free navigation of the same.

12. If the jury believe from the evidence, that boats can not, at all times, and under all circumstances, pass said bridge, by using ordinary care and skill, without injury, when, if there was no bridge there, they could pass without injury, under the same circumstances, by using ordinary care and skill, then said bridge would amount to a material obstruction.

The consideration of these instructions presents a fit occasion for the expression of our views, briefly, on the merits of the whole controversy, and on the respective rights of the parties in this controversy, and of all others navigating the Illinois river above or below the Peoria bridge.

As to the eleventh instruction, it asks the court to give an opinion on a question on which the best informed public economists and statesmen of the age differ very much. It is

31—38TH ILL.

by no means certain, that the navigation of the Illinois river, which, at some seasons of the year can scarcely float an armfull of baggage, and at another season is bound in fetters of ice, is of more importance to the public welfare than the free transit of goods and produce, at all seasons of the year, and in the largest quantities, across its channel. The terms of the instruction would comprehend railroad bridges, equally with this, of which complaint is made. When we consider the vast amount of property, which monthly passes over this stream at all seasons on the bridges which span it, and contrast it with the amount carried, in portions only of the year, up and down the river on boats, it will not be difficult to determine, in that aspect, that the claims of the river to an overshadowing importance, are not well established. Probably, much greater values are transported over this river by the bridges spanning it than are transported by the river from points above and below the bridge. If this be so, the court might well decline to say the navigation of the river is of most importance to the public weal—that it is paramount to all conflicting rights, and that no one, not even the State, in the exercise of the power of eminent domain, or of any other power pertaining to her sovereignty, has the right to erect a bridge across it, if it, in the least, obstructs its free navigation. The court did not err in refusing to give this instruction.

Nor did the court err in refusing the twelfth instruction.

Holding as we do, that the right of navigation is not paramount, that it is not of the most importance to the public welfare, the true doctrine is, that conceding the right of the State to authorize building bridges over the navigable waters lying within its jurisdiction, such structures should be so erected as to interfere as little as possible with the right of free navigation; and if in this case, or in any other, it be proved on the trial, that the bridge is of the most approved construction, and sufficient way left for the passage of boats in ordinary conditions of the wind and stages of water, those navigating them, at the same time using proper care and cau-

tion, it shall not be averred of such bridge, that it materially obstructs the navigation of the river.    If the wind and water are unpropitious to an attempt to pass through the draw, then ordinary caution would require the vessel to stop until the danger had passed.    Suppose there was a large rock or other firmly fixed natural obstruction in the channel of the river, which in some conditions of the wind and water it would be dangerous to attempt to pass, the same prudence and caution which would require delay for a more favorable condition of these elements, is demanded when a bridge is about to be passed.    On this principle all the useful rights of navigation are sufficiently protected and encouragement given to those great enterprizes with which our State abounds, and without which, our agricultural productions and manufactures would perish on the hands of their owners, the rivers being dried up in autumn, and chained by ice in the winter.

In the case of the *Columbian Ins. Co.* v. *The Peoria Bridge Co.*, 6 McLean, 72, the able and learned judge who delivered the opinion in that case entertained similar views to those we hold, when he said the right of free navigation of this river is not inconsistent with the right of the State to provide means of crossing the river by bridges or otherwise, when the wants of the public require them, provided such bridges do not, essentially, injure the navigation of the river.    It must be considered as settled, that the right to a free navigation of our western rivers, and the right of the State to adopt those means of crossing them which the skill and ingenuity of man have devised, as both are equally important, are co-existent, and neither can be permitted to destroy or essentially impair the other.    The authority to construct a bridge across a navigable water wholly in this State should be exercised in such a manner, as, while it gives full effect to the power itself, it should interfere as little as possible with the right of free navigation; and this is the true test whether a particular structure is such an obstruction as is contrary to law.

We go somewhat farther, and say, since it is in the very nature of these structures to obstruct, in some degree, free navigation, by contracting the channel or otherwise, and while it is admitted the State had the power to authorize their erection, a bridge constructed on the most approved plan, at the proper place and with sufficient channel between the piers, over any of our navigable waters, cannot, under any circumstances, be held to be a material obstruction of the navigation, if it be shown that in ordinary times with ordinary wind and water, the draw can be safely passed, and it be further shown that no better structure could be erected for the purpose designed with the amount of outlay usually demanded for such undertakings. If, on reaching one of these bridges, the vessel should be overtaken by an unfavorable wind, or by any other circumstance that should render some delay prudent, the delay must be incurred, for the right to erect the bridge is co-extensive with the right to navigate the river, and boats should not, heedlessly, tempt or run into danger. *Ward et al.* v. *Propeller A. Rossiter*, 6 McLean, 63 ; *Jolly et al* v. *T. H. Drawbridge Co.*, ib. 238.

The case is not wanting in proof that the attempt to pass the bridge at the time, after the warning of the captain to the pilot when the boat was on her upward trip, was rash and imprudent. He said to him, "Sam, Farm Creek is running pretty strong, you will have to look out for it when we return." That same night, about 6 or 8 o'clock, with this fact before them, the boat attempted the passage, and was carried against one of the piers of the bridge. Captain Rhodes states, he considered, from the fact of the strong current from Farm Creek and the wind blowing from the east, that there was some risk in passing down through the draws. This was in March, when it is dark at 6 o'clock. Had the boat waited for daylight it is not probable the accident would have occurred. There is no charge made of any deficiency in the plan or structure of the bridge, nor is it intimated that any bridge better devised, could be placed at that or at any other point near

there.    Then, since the bridge was built  by authority of  the
State, the navigation of the river  must be subjected  to the in-
convenience and delays which  may, sometimes, be  occasioned
by it.

It is insisted  by the· plaintiff the' acts  of  the  Legislature
authorizing this bridge  to be  built should  not have been  per-
mitted to be read in evidence—that  the court erred in  permit-
ting it, and  in giving for  the defendants the  third, fourth and
fifth instructions founded thereon.    It  is said,  this  evidence
was calculated  to mislead and  confuse the  jury,  and  that
there was no issue in the  case to  warrant  their introduction—
that the right to build the bridge was not disputed—that their
introduction  was  calculated  to lead  the  jury to believe  that
they furnished a full and  complete  defence  to the  action, and
the jury must have been greatly influenced by them.

We think this testimony was proper under the general issue.
It was necessary for the defendant to  show some authority for
being at that spot.   It might well  be contended, if they  were
there without right, they were not entitled  to claim any privi-
leges or protection  from  the law.    But, be this as  it may, if
the plaintiff's counsel supposed the  jury would  be misled by
those acts of the Legislature, it was quite easy, as it was their
privilege, to require of the court specific instructions as to the
effect of those acts.

Upon the whole merits of  this controversy, as developed in
the record, we are free to say that as the right to build a  bridge
over this river under a grant of the legislature, is .co-
extensive with the right of navigating the river,  a bridge
constructed  on the  most approved  plan,  leaving such a pass-
way for vessels as is here shown, near one hundred  and thirty
feet in width, probably  the widest in the world, cannot be by
this court adjudged to be a material obstruction to  the naviga-
tion of  the river.

It is insisted,  however,  that the  ordinance for the  Govern-
ment of the territory north west of the Ohio  river, adopted  in
1787, is in force, and  by it no such obstruction as a bridge over

the waters therein specified is permitted, since, by such structures, they would cease to be common highways.

It is unnecessary to decide the question whether this ordinance is in force or not.

But what is the provision of article 4 of the ordinance of 1787 ? It is this: The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, etc., without any tax, impost, or duty therefor. (Scates' Comp. 24.)

The meaning of this expression, "shall be common highways and forever free," is made very manifest by the concluding words, "without any tax, impost, or duty therefor."

This river is a common highway, free to the Indian in his bark canoe, and to every other vessel floating upon the water, whether propelled by animal power, by the wind, or by the agency of steam. It is a common highway, free and so forever to remain, to all citizens of the United States, no matter where residing, not one of whom, in the free use of it, can be compelled, under any pretext, to pay any tax, impost or duty whatever therefor, nor against its use shall there be an obstruction.

There is no restriction on the power of the State, if this ordinance be still in force, to use the most approved artificial means for crossing those waters. It only prohibits its obstruction, and the imposition of any tax or duty on its navigation. Suppose the channel of the river is slightly contracted by piers indispensable in the construction of a draw bridge, can it be alleged that the free navigation of the river no longer exists. Does it not remain a common highway, free as before, for the passage of every description of craft accustomed to navigate that water ? If a dam was made or a duty levied on vessels for opening the draw, it might with truth be said, the navigation was obstructed, and had been made subject to this tax or duty contrary to the ordinance; but it cannot be affirmed it is

not a common highway, the use of which is not free, merely because an inconsiderable portion of the shallow parts, or edges of the main channel of the river are occupied by the piers without which no proper bridge can be constructed.   So that the navigation is left free, in the sense in which we expound this provision of the ordinance, nothing less than a total obstruction by dams, or other impediments of that nature, would be a violation of its provisions.  Navigation on it would not then be free, for the very current itself would be in custody, and mankind be excluded thereby from its profitable use.

The ordinance does not mean that the river and its navigation shall be a common highway, free from all and every condition, but only that it shall be free from obstruction, and free from any burden imposed in the shape of a duty or tax.   The right of pontage is as important to the public, as much so in this case, as the free navigation of the river, and whilst the latter is unmolested, is left intact, it would be unjust to subordinate those great interests, so well subserved by these structures over our navigable waters, and without which they could not be promoted, to the trifling fact that some delay in navigation is caused by them—that trips cannot be made quite so speedily, by an hour or two, as they could be made before the structures were placed in position—that pilots and captains must use a little more care and prudence than they have been accustomed to use—that higher wages must be paid to competent officers and pilots, thereby commanding the highest skill.   So long as the navigation of this river is open, and burdened with no duty, impost or tax, navigation is essentially free, no matter how many bridges, with capacious draw, may span its beautiful bosom.

It will be seen the ordinance of 1787 includes navigable waters leading into the St. Lawrence river, and they are declared forever free.   The Chicago river is such a water, pouring, by the ocean-lakes, its comparatively trifling flood into the St. Lawrence, the latter wholly within a foreign jurisdiction.

On the borders of this little river, within the memory and active life of men yet young, now performing their parts on its busy stage, a city has grown up, numbering near two hundred thousand people, who are separated, by the peculiarities of the river, into three great divisions, with an equal number of inhabitants, or nearly so, in each, the river, by its main stem and branches rising and running in directly opposite directions, capable of sustaining vessels of great draft of water, affording a harbor for them, of more than fifteen miles in extent, is spanned in its course to the lake, by several bridges, over which vast crowds of people and property, in vehicles of every description, horsemen, footmen and carriages, hourly pass. Has any one ever supposed the facilities of intercourse and business afforded by these structures, should be, of right, subordinated to even the immense commerce which crowds the channel of this river and whitens, in the season of navigation, its bosom with their canvass? Has any one advanced the idea that those bridges, furnished with capacious draws, for the passage of vessels, materially obstruct its navigation? Or if they do, have not all yielded to the necessity of their erection? How could the business and intercourse of that great and growing city be carried on without these facilities; and while the navigation of the river is not subjected to any tolls or duties, who has a right to complain of these structures? Has it ever been supposed that river is not a highway, as common and as free for navigation as it was when animated only by the Indian in his canoe? It is a common highway, as every day shows, and free, because no duty, tax, impost or charge of any description is imposed upon the use of its water for purposes of navigation. In the same sense is the Illinois river a common highway and its navigation free, and will remain so, when spanned by a hundred bridges, provided a sufficient channel is left, and no tax or duty levied on the use of its water. A mere delay in passing these bridges, which prudence would advise at unpropitious moments, when winds and currents are not favorable, can not, in our judgment, affix

to them the quality of a material obstruction, or of any other description of obstruction, for the erection of which the owners should be liable in damages. It is a matter of necessity that the franchise of navigation should be constrained to meet the exigency and yield some of its asserted rights for the sake of works of such great public utility. As the bridge could not be built without the piers, the construction, being on an approved plan, and placed where they should be placed, relieve the defendants from any responsibility, if the piers were the cause of the injury, if no negligence be shown by them.

But it is not only the navigable waters which shall be common highways and forever free, but also the "carrying places" between the same.

To understand fully this provision, we must consider the condition of the country through which those streams flowed, and the mode by which the trifling commerce of that region was carried on, when the ordinance of 1787 was adopted. History tells us it was then a barbarous region, peopled by savages, whose frail barks were the only vessels which floated on these waters, and whose light paddles were then their only propelling power. These slight vessels, loaded with the products of the chase or of successful trapping, in their route to Montreal or Quebec, then the great markets for furs and peltries, on reaching the highest point accessible to them by water, would be unloaded, and the boats and cargo carried on the backs of the *employees* across, by land, to another stream, flowing in the required direction. These places were called "portages," or carrying places. Who shall say that these noted carrying places, shall not, at some future day be occupied by a railroad, or several of them, and by canals, should the wants of the extended and growing commerce of the fruitful regions where they are, demand them? Shall this provision of the ordinance be an insuperable bar to such improvements, and thus fetter forever the commercial energies of that region? All that can be claimed is, that as carrying places they shall remain free as a common highway to all whose interests may

require their use as such—interests so trifling and inconsiderable, so dwarfed by the growth and progress of the country, as not to stand in the way of the canal boat, the steam boat, and the railroad car. The same considerations apply to the rivers themselves, and must be made practical, by the necessities of our existence as a great commercial people.

For the error of the court in ruling on the evidence, on which we have commented, and believing it might have had an unfavorable influence on the plaintiff's rights, and have affected the case in some way to his injury, by rejecting proper testimony, the judgment must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

On another trial the questions of the proper construction of the bridge and of the care and diligence of those in charge of it, and also of the proper management of those in charge of the boat, will be submitted to the jury, under instruction from the court, prepared in conformity with this opinion.

*Judgment reversed.*