**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES COURTNEY and CLIFFORD
COURTNEY,

   *Plaintiffs-Appellants*,

    v.

JEFFREY GOLTZ, chairman and
commissioner; PATRICK OSHIE,
commissioner; PHILIP JONES,
commissioner, in their official
capacities as officers and members
of the Washington Utilities and
Transportation Commission; DAVID
DANNER, in his official capacity as
executive director of the Washington
Utilities and Transportation
Commission,

   *Defendants-Appellees*.

No. 12-35392

D.C. No.
2:11-cv-00401-
TOR

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued May 6, 2013
Submitted December 2, 2013
Seattle, Washington

Filed December 2, 2013

Before: Michael Daly Hawkins, Sidney R. Thomas,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[*]

### Civil Rights/Pullman Doctrine

The panel affirmed in part and vacated in part the district court's dismissal of an action in which plaintiffs challenged Washington statutes that require a certificate of "public convenience and necessity" in order to operate a ferry on Lake Chelan in central Washington state.

Plaintiffs first alleged that the state laws abridged their right to use the navigable waters of the United States, in violation of the Privileges or Immunities Clause of the Fourteenth Amendment. The panel held that the Privileges or Immunities Clause of the Fourteenth Amendment does not encompass a right to operate a public ferry on intrastate navigable waterways and affirmed the district court's dismissal of this claim.

Plaintiffs also challenged the certificate requirement as applied to the provision of boat transportation services on Lake Chelan solely for patrons of specific businesses. As to this claim, the panel found that the district court properly abstained from deciding the issue under the doctrine set forth

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), but that the district court should have retained jurisdiction instead of dismissing the claim. Therefore, the panel vacated and remanded the second claim with instructions that the district court retain jurisdiction over the constitutional challenge.

---

**COUNSEL**

Michael Eugene Bindas (argued) and Jeanette Motee Petersen, Institute for Justice, Bellevue, Washington, for Plaintiffs-Appellants.

Fronda Colleen Woods (argued), Assistant Attorney General, Office of the Attorney General, Olympia, Washington, for Defendants-Appellees.

David Wiley, Williams Kastner, Seattle, Washington, for Amicus Curiae.

---

**OPINION**

NGUYEN, Circuit Judge:

James and Clifford Courtney challenge Washington statutes that require a certificate of "public convenience and necessity" ("PCN") in order to operate a ferry on Lake Chelan in central Washington state. The Courtneys claim that these state laws abridge their right to use the navigable waters of the United States, in violation of the Privileges or Immunities Clause of the Fourteenth Amendment. The

Washington Utilities and Transportation Commission and its various officers and directors (collectively, "WUTC") successfully moved to dismiss the case and this appeal followed.

The Courtneys' first claim for relief challenges the constitutionality of the PCN requirement as applied to the provision of public ferry service on Lake Chelan. We hold that the Privileges or Immunities Clause of the Fourteenth Amendment does not encompass a right to operate a public ferry on intrastate navigable waterways and affirm the district court's dismissal of this claim. The Courtneys' second claim challenges the PCN requirement as applied to the provision of boat transportation services on Lake Chelan solely for patrons of specific businesses. As to this claim, we find that the district court properly abstained from deciding the issue under the *Pullman* doctrine, but that it should have retained jurisdiction instead of dismissing the claim. Therefore, we vacate and remand the second claim with instructions that the district court retain jurisdiction over the constitutional challenge.

## BACKGROUND

## I

James and Clifford Courtney are fourth-generation residents of Stehekin, a small unincorporated community on the northwest end of Lake Chelan in central Washington state. Lake Chelan is a narrow, fifty-five-mile long lake, which has been designated by the Army Corps of Engineers as a "navigable water of the United States." The northwest portion of Lake Chelan, including Stehekin, is part of the Lake Chelan National Recreation Area. Although it is only

accessible by boat, plane, or foot, Stehekin has long been a summer destination for tourists. *See* WUTC, *Appropriateness of Rate and Service Regulation of Commercial Ferries Operating on Lake Chelan* 3–4 (2010), *available at* http://www.wutc.wa.gov/webimage.nsf/0/ d068a7290f85512a882576ac007e2d73/ ("Ferry Report"). The Courtneys and their siblings own and operate several businesses in Stehekin, which provide lodging and recreational activities such as white water rafting tours and horseback riding.

Most tourists and residents reach Stehekin by way of a public ferry operated by the Lake Chelan Boat Company. The state has regulated ferry service on Lake Chelan since 1911. By the 1920s, there were at least four different ferry companies offering services on Lake Chelan. Then, in 1927, the Washington legislature enacted a law that conditioned the right to operate a ferry service upon certification that such service was required by "public convenience and necessity."[1]

---

[1] The Courtneys cite a 1927 *Seattle Daily Times* article in support of their argument that the legislature's goal in passing the PCN requirement was to protect existing ferry owners from competition, and have asked that we take judicial notice of this article. Because we do not rely upon the article, we deny the motion.

The Ferry Report describes the rationale for the regulation as follows: for certain industries that "typically have very high capital costs, benefit from economies of scale, and provide an indispensable service to the public[,] . . . the legislature has made a judgment that the public's interest in reliable and affordable service is best served by a single, economically regulated provider whose owners can make the sizeable investments needed to initiate and maintain service without the threat of having customers drawn away by a competing provider." Ferry Report 11.

## II

### A

In its current form, Washington Revenue Code § 81.84.010 dictates that a "commercial ferry may not operate any vessel or ferry for the public use for hire between fixed termini or over a regular route upon the waters within [Washington] . . . without first applying for and obtaining from the [WUTC] a certificate declaring that public convenience and necessity require such operation." Wash. Rev. Code § 81.84.010(1). In order to obtain a PCN certificate, a potential ferry operator must prove that its proposed operation is required by "public convenience and necessity," and that it "has the financial resources to operate the proposed service for at least twelve months." *Id.* § 81.84.020(1)–(2). If the territory in which the applicant desires to set up operation is already served by a commercial ferry company, no PCN certificate may be granted unless the applicant proves that the existing certificate holder: "[(a)] has failed or refused to furnish reasonable and adequate service[; (b)] has failed to provide the service described in its certificate or tariffs after the time allowed to initiate service has elapsed[;] or [(c)] has not objected to the issuance of the certificate as prayed for." *Id.* § 81.84.020(1).

### B

Since the statute's enactment, only one PCN certificate has been issued for providing ferry services on Lake Chelan. It is now held by Lake Chelan Recreation, Inc. d/b/a Lake

Chelan Boat Company.[2]  In 1997, James Courtney applied for a PCN certificate to operate a commercial ferry out of Stehekin.  The Lake Chelan Boat Company objected, and the WUTC denied Courtney's application, finding that the Lake Chelan Boat Company provided "reasonable and adequate service," the proposed service might "tak[e] business from" the company, and Courtney failed to satisfy the financial responsibility requirement.  Courtney did not seek judicial review of the WUTC's decision.  *See* Wash. Rev. Code §§ 34.05.570, 34.05.574.

In 2006, James Courtney explored the possibility of starting an on-call boat service out of Stehekin, which he thought might fall within the "charter service" exemption to the PCN requirement.  Because the proposed service would need to utilize federally owned docks, Courtney applied to the United States Forest Service for a special-use permit, which required confirmation that the proposed service was actually exempt from the PCN requirement.  The WUTC initially opined that a PCN certificate would not be needed for the proposed on-call boat service, but changed its mind after the Lake Chelan Boat Company objected to the proposal. Several months later, the WUTC again reversed course, indicating that the proposed service would be exempt from the PCN requirement. However, no formal decision was ever rendered. WUTC's executive director, David Danner, did not respond to the Forest Service's request for an advisory opinion on this issue.

---

[2] At least four potential ferry operators have applied for a PCN certificate over the last sixty years, but all were denied by the WUTC after Lake Chelan Boat Company objected to the applications.

In 2008, Clifford Courtney wrote to David Danner, inquiring whether various other kinds of boat transportation services (distinct from the proposed on-call service) would require a PCN certificate. The suggested services included (a) one in which Clifford would charter a boat and offer transportation as part of a package for guests who intended to stay at his ranch and go river rafting, and (b) a scenario in which he would purchase his own vessel in order to transport patrons of his various Stehekin-based businesses. Danner responded that such services would require a certificate because they would still be "for the public use for hire," and that it "[did] not matter whether the transportation [Clifford] would provide [was] 'incidental to'" other businesses. However, Danner noted that his response merely reflected the opinion of the WUTC staff and Courtney was free to pursue a formal declaratory ruling by the commissioners provided that "the existing certificate holder . . . agree[d] to participate" in the proceeding. Were Courtney simply to proceed with the proposed service, the WUTC could initiate a "classification proceeding," during which Clifford would be required to testify and prove that his activities did not require a PCN certificate. The WUTC also orally confirmed to Courtney that his proposed services would likely require a PCN certificate.

## C

In 2009, after Clifford Courtney wrote to the governor and several state legislators regarding the PCN requirement, the legislature directed the WUTC to conduct a study on the regulation of commercial ferry services on Lake Chelan. The report by the WUTC, which issued in January 2010, concluded that Lake Chelan Boat Company was providing satisfactory service and recommended that there be no change

to the existing laws and regulations. The WUTC noted that there might be flexibility under the existing law to permit some competition by exempting certain services from the PCN certificate requirement, provided that any such service would not "significantly threaten" the existing certificate holder's business.

## D

In October 2011, the Courtneys sued the WUTC and various commissioners and directors in their official capacities, seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. The Courtneys claimed that the PCN requirement abridges their right to use the navigable waters of the United States under the Privileges or Immunities Clause of the Fourteenth Amendment, and is therefore unconstitutional.

The WUTC moved to dismiss the Courtneys' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion. The district court dismissed the Courtneys' first claim—challenging the constitutionality of the PCN requirement as applied to the provision of public ferry service on Lake Chelan—with prejudice. The district court concluded that it was unclear that the "right to use the navigable waters of the United States" was "truly a *recognized* Fourteenth Amendment right," and that even if it was, it did not extend to protect the right "to operate a ferry service open to the public." The district court dismissed the Courtneys' second claim—challenging the constitutionality of the PCN requirement as applied to provision of boat transportation services on Lake Chelan solely for patrons of specific businesses—without prejudice. As to the second claim, the court held that the Courtneys lacked standing; their

claim was unripe; and, notwithstanding its ripeness finding, the court would abstain pursuant to *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).

## DISCUSSION

## I

To state a claim for relief under 42 U.S.C. § 1983, the Courtneys must allege facts that, if true, constitute a violation of a right guaranteed by the United States Constitution. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Their claim for declaratory relief under 28 U.S.C. § 2201 similarly requires that the Courtneys allege facts that, if true, would violate federal law. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672 (1950).

"We review *de novo* a district court's dismissal for failure to state a claim under Federal [Rule of] Civil [Procedure] 12(b)(6)." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). In doing so, we take all factual allegations in the complaint as true and construe them in the light most favorable to the Courtneys. *See id.*

## II

## A

The Courtneys argue that the district court erred in dismissing their first claim relating to the provision of public ferry service because the Privileges or Immunities Clause of the Fourteenth Amendment protects the right "to use the

navigable waters of the United States."**[3]** We agree with the district court that even if the Privileges or Immunities Clause recognizes a federal right "to use the navigable waters of the United States," the right does not extend to protect the Courtneys' use of Lake Chelan to operate a commercial public ferry.

In its seminal decision interpreting the Privileges or Immunities Clause of the Fourteenth Amendment—the *Slaughter-House Cases*, 83 U.S. 36 (1872)—the Supreme Court upheld a Louisiana statute that granted a private company the exclusive right to operate a slaughter-house on the Mississippi River. *Id.* at 58–61, 83. In doing so, the Court distinguished between rights that accompany state citizenship and those that exist by virtue of United States citizenship. *Id.* at 72–77. The Court explained that the Fourteenth Amendment protects "the privileges or immunities of citizens of *the United States*," which are distinct from those that exist by virtue of *state* citizenship. *Id.* at 73–74 (emphasis in original).

---

[3] Section I of the Fourteenth Amendment reads:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. *No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States*; nor shall any state deprive any person of liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1 (emphasis added).

The "privileges *and* immunities" referred to in Article IV are conferred by *state* citizenship and consist of those rights "which are *fundamental*; which belong of right to the citizens of all free governments, and which have at all times been enjoyed by citizens of the several States which compose this Union, from the time of their becoming free, independent, and sovereign." *Id.* at 76 (first emphasis added, second emphasis in original). They fall under "the following general heads: protection by the government, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety, subject, nevertheless, to such restraints as the government may prescribe for the general good of the whole." *Id.* (internal quotation marks omitted).

By contrast, the "privileges *or* immunities" discussed in the Fourteenth Amendment consist of rights "which ow[e] their existence to the Federal government, its National character, its Constitution, or its laws." *Id.* at 79 (emphasis added). In analyzing the legislative history of the Thirteenth and Fourteenth Amendments, the Court noted that "the one pervading purpose" of the amendments was to ensure "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." *Id.* at 71.

**B**

The Supreme Court in the *Slaughter-House Cases* ultimately concluded that the rights asserted by the butchers were rights "which belong to citizens of the States as such," and therefore the Court did not need to "defin[e] the privileges and immunities of citizens of the United States which no State can abridge, until some case involving those

privileges [made] it necessary to do so." *Id.* at 78–79. However, the Court suggested some examples of inherently federal privileges, such as the right "to demand the care and protection of the Federal government over his life, liberty, and property when on the high seas . . .[,] [t]he right to peaceably assemble and petition for redress of grievances, . . . [and t]he *right to use the navigable waters of the United States*, however they may penetrate the territory of the several States." *Id.* at 79 (emphasis added).

The Courtneys' case is predicated entirely on the Supreme Court's passing reference to a "right to use the navigable waters of the United States"—a phrase that has yet to be interpreted by a single federal appellate court in the privileges or immunities context. As such, the boundaries of the term "use" have not been established. Still, we are not faced with an entirely blank slate. The historical backdrop upon which the Supreme Court enunciated the navigable waterway right strongly suggests that the Court did not intend a panoptic definition of the term. Moreover, our Privileges or Immunities Clause jurisprudence does not support an interpretation that would foreclose states from regulating public transportation upon their intrastate navigable waterways. Thus, even if we assume that the examples of rights deriving from national citizenship set forth by the Supreme Court in the *Slaughter-House Cases* are not mere dicta, we nevertheless find that the right "to use the navigable waters of the United States" does not include a right to operate a public ferry on Lake Chelan.

Turning to the historical context, Article 4 of the Northwest Ordinance of 1787 established navigable waters within newly federal territory as "common highways" that would be "forever free," even in the event portions of the

Northwest Territory were incorporated into newly formed States. Ordinance of 1787 art. IV; *Econ. Light & Power Co. v. United States*, 256 U.S. 113, 118–19 (1921) ("The public interest in navigable streams . . . does not arise from custom or implication, but has a very definite origin[;] [b]y article 4 of the compact in the Ordinance of July 13, 1787 . . . it was declared: 'The navigable waters . . . shall be common highways, and forever free . . . as to the citizens of the United States . . . .'").

Cases interpreting the language in the Northwest Ordinance emphasize the states' responsibility to avoid destroying navigable waters or rendering them *unnavigable*.[4] The Supreme Court has explicitly held that the Ordinance did

---

[4] *See, e.g.*, *Ill. River Packet Co. v. Peoria Bridge Ass'n*, 38 Ill. 467, 479 (1865) ("The ordinance does not mean that the river and its navigation shall be . . . free from all and every condition, but only that it shall be free from obstruction . . . ."); *Nedtweg v. Wallace*, 237 Mich. 14, 20 (1926) ("[T]he [1787] ordinance accomplished no more than to preserve the rivers and lakes as common highways and in no sense prevents the state from granting the soil under navigable waters to private owners. The state is sovereign of the navigable waters within its boundaries, bound, however, in trust, to do nothing in hindrance of the public right of navigation, hunting, and fishing." (citation omitted)); *Sewers v. Hacklander*, 219 Mich. 143, 150 (1922) (holding that Article 4 of the Northwest Ordinance has "no bearing upon riparian rights and ownership, except [if] there is an interference with navigation"); *Hogg v. Zanesville Canal & Mfg. Co.*, 5 Ohio 410, 416 (1832) ("Every citizen of the United States has a perfect right to its free navigation. A right derived, not from the legislature of Ohio, but from a superior source. With this right the legislature can not interfere. In other words, they can not, by any law which they may pass, impede or obstruct the navigation of this river."); *Spooner v. McConnell*, 22 F. Cas. 939, 945 (Ohio C.C. 1838) ("[T]he legislature may improve . . . the navigable rivers of the state, and authorize the construction of any works on them which shall not materially obstruct their navigableness.").

not prevent states from granting exclusive ferry franchises, so long as such franchises did not encroach on the federal commerce power. *See Fanning v. Gregoire*, 16 How. (U.S.) 524, 534 (1853) (holding that "the free navigation of the Mississippi river . . . does not . . . interfere with the police power of the States, in granting ferry licenses"); *Conway v. Taylor*, 66 U.S. 603, 635 (1861) (noting that "[since] before the Constitution had its birth, the States have exercised the power to establish and regulate ferries," not Congress, and that "the authority [to do so] lies within the scope of 'that immense mass' of undelegated powers which 'are reserved to the States respectively[]'").

In light of the foregoing, a reasonable interpretation of the right to "use the navigable waters of the United States," and the one we adopt, is that it is a right to *navigate* the navigable waters of the United States. Here, it is clear that the Courtneys wish to do more than simply navigate the waters of Lake Chelan. Indeed, they are not restrained from doing so in a general sense. Rather, they claim the right to utilize those waters for a very specific professional venture. While navigation of Lake Chelan is a necessary component of the Courtneys' proposed activity, it is neither sufficient to achieve their purpose nor the cause of their dissatisfaction. The Supreme Court in the *Slaughter-House Cases* declined to define the plaintiffs' asserted rights broadly, finding that the statute did not prohibit the butchering of animals in general because it was specifically "the slaughter-house privilege, which [was] mainly relied on to justify the charges of gross injustice to the public, and invasion of private right." *Slaughter-House Cases*, 83 U.S. at 61. Similarly here, the district court correctly identified the actual privilege at stake as a ferry operation privilege, not a broad navigation privilege. Were navigation all the Courtneys wished to do,

they would not need the WUTC's permission and this dispute would never have arisen. We find it exceedingly unlikely that the Supreme Court in the *Slaughter-House Cases* contemplated operation of a public ferry as part of the right "to use the navigable waters of the United States," so as to divest the states of their historic authority to regulate public transportation on intrastate navigable waterways.

Indeed, the *Slaughter-House* decision, itself, contains suggestions that contradict such an understanding. In discussing the nature of the states' police power, the majority noted that, with respect to "laws for regulating the internal commerce of a State, and those which respect . . . ferries . . . [, n]o direct general power . . . is granted to Congress; and consequently they remain subject to State legislation." *Id*. at 63 (quoting *Gibbons v. Ogden*, 22 U.S. (Wheaton) 1, 203 (1824)) (internal quotation marks omitted). Moreover, while the dissenting minority disagreed with the majority's acceptance of a slaughter-house monopoly, it seemed to approve of ferry franchises, stating that

> [i]t is the duty of the government to provide suitable roads, bridges, and ferries for the convenience of the public, and if it chooses to devolve this duty to any extent . . . upon particular individuals or corporations, it may of course stipulate for such exclusive privileges . . . as it may deem proper, without encroaching upon the freedom or the just rights of others.

*Id.* at 88 (Field, J., dissenting).

Further, the driving force behind this litigation is the Courtneys' desire to operate a particular business using Lake Chelan's navigable waters—an activity driven by economic concerns. We have narrowly construed the rights incident to United States citizenship enunciated in the *Slaughter-House Cases*, particularly with respect to regulation of intrastate economic activities. *See, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978, 983–84 (9th Cir. 2008).[5]

## C

Finally, although the *Slaughter-House* Court acknowledged that "the right to engage in one's profession of choice" was a "fundamental" privilege belonging to "citizens of all free governments," it "made it very clear" that such a right "[was] *not* protected by the Privileges or Immunities Clause if [it was] not of a 'federal' character." *Id*. at 983 (emphasis added) (citations omitted). Operation of a ferry service is not inherently "federal" in character. To the contrary, the regulation of ferry operation has traditionally been the prerogative of state and local authorities. *See, e.g.*, *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 215–17

---

[5] In *Merrifield*, we upheld a pest-control licensing requirement under the Privileges or Immunities Clause, despite the appellant's contention that the license requirement "infringe[d] on his right to practice his chosen profession." 547 F.3d at 983. We noted that the Supreme Court's decision in *Saenz v. Roe*, 526 U.S. 489 (1999), "represents the Court's only decision qualifying the bar on Privileges or Immunities claims against 'the power of the State governments over the rights of [their] own citizens,'" *id*. at 983 (quoting *Slaughter-House Cases*, 83 U.S. at 77); that "[*Saenz*] was limited to the right to travel[,]" *id*. at 984; and that "[t]he Court has not found other economic rights protected by [the Privileges or Immunities C]lause," *id*. We have made clear that this "limitation on the Privileges or Immunities Clause" remains in effect. *See id*.

(1885) (recognizing that "[t]he power of the states to regulate matters of internal police includes the establishment of ferries" so long as regulations do not burden interstate commerce); *Can. Pac. Ry. Co. v. United States*, 73 F.2d 831, 833 (9th Cir. 1934) (explaining that "[a]t common law a franchise was necessary to the creation of a ferry and . . . an integral part of the definition"); *Kitsap Cnty. Transp. Co. v. Manitou Beach-Agate Pass Ferry Ass'n*, 30 P.2d 233, 234–35, 237 (Wash. 1934) (finding a state PCN requirement to be within the state's police power in order to serve "the best interests of the traveling public at large").

In this case, the state of Washington has a vital interest in regulating traffic on its navigable waterways. As the WUTC noted in its Ferry Report, "[t]he combination of statutory protection from competition, on the one hand, and stringent regulation of rates and terms of service, on the other, has historically been adopted for industries believed to have characteristics of a 'natural monopoly.'" Ferry Report 11 (citing Charles F. Phillips, Jr., *The Regulation of Public Utilities* 49–73 (3d ed. 1993)). The PCN requirement creates precisely the kind of ferry franchise that has existed with approval since before the *Slaughter-House Cases* were decided. *See, e.g.*, *Conway*, 66 U.S. at 633–35.

The Courtneys contend that ferry operation on Lake Chelan is "nationalized" because of the "national character of the forum in which such a ferry operates," and that Lake Chelan is "uniquely federal" due to its incorporation into "the federal Lake Chelan National Recreation Area." However, the Courtneys provide no actual authority for the proposition that the Lake Chelan National Recreation Area renders unconstitutional state regulation of ferry service on wholly intrastate waterways. The Lake Chelan National Recreation

Area does not appear to contemplate preemption of state ferry regulations, and the federal government has in the past refrained from exercising exclusive jurisdiction over its National Recreation Areas. *See* 16 U.S.C. § 90a-1; *see also Silas Mason Co. v. Tax Comm'n of Wash.*, 302 U.S. 186, 244 (1937) (finding that "the evidence is clear that the Federal Government contemplated the continued existence of state jurisdiction consistent with federal functions" with respect to the federal Grand Coulee Dam site in Lake Roosevelt); 36 C.F.R. § 7.55 (setting forth regulations for Lake Roosevelt as a National Recreation Area).

## D

At the end of the day, the state legislation the Courtneys challenge is narrow in scope, merely restricting the operation of commercial public ferries to those who obtain a PCN certificate. The PCN requirement does not constrain the Courtneys from traversing Lake Chelan in a private boat for private purposes. *See* Wash. Rev. Code § 81.84.010(1) (restricting ferry operation "for the public use for hire"). Nor does it affect their ability to operate a commercial freight transportation service. *See id.* For that matter, the Courtneys are free to operate a commercial ferry service so long as they apply for and obtain a PCN certificate. *See id.* Although the Courtneys have apparently found the PCN requirement to be a difficult hurdle to surmount, "the hardship, impolicy, or injustice of state laws is not necessarily an objection to their constitutional validity." *Mo. Pac. Ry. Co. v. Humes*, 115 U.S. 512, 520–21 (1885). Because we hold that the Privileges or Immunities Clause of the Fourteenth Amendment does not protect a right to operate a public ferry on Lake Chelan, we affirm the district court's dismissal of the Courtneys' first claim for relief.

## III

The district court declined to express an opinion as to whether the right to use the navigable waters of the United States covers the use of such waters for private boat services for patrons of specific businesses or groups of businesses. Instead, it found that the Courtneys lacked standing, the claim was unripe, and the issue was appropriate for abstention under the doctrine enunciated in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). We disagree as to standing[6] and need not reach the ripeness issue because we find that the district court did not abuse its discretion in abstaining from considering the claim under the *Pullman* doctrine. However, we conclude that the district court should have retained jurisdiction over the Courtneys' case and vacate and remand with instructions that it do so.

The *Pullman* doctrine is "based on the avoidance of needless friction between federal pronouncements and state policies." *Reetz v. Bozanich*, 397 U.S. 82, 87 (1970) (internal quotation marks omitted). It vests federal courts with discretion[7] to abstain from adjudicating disputes that hinge on

---

[6] Although a close question, the threat of a classification proceeding, Washington Supreme Court precedent, and the economic loss the Courtneys have already suffered from having to refrain from purchasing a vessel for which they had negotiated favorable terms make their fear of enforcement and injury sufficiently actual to confer standing here.

[7] The district court incorrectly stated that a federal court "must abstain" from considering a federal constitutional question if the *Pullman* requirements are satisfied. To the contrary, its ultimate decision to abstain is discretionary under such circumstances. *See Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 889 (9th Cir. 2011) ("*Pullman* is a discretionary doctrine that flows from the court's equity powers.").

significant and unsettled questions of state law. *See Pullman*, 312 U.S. at 499–500.

Abstention under *Pullman* is an appropriate course where

>   (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the possible determinative issue of state law is uncertain.

*Confederated Salish v. Simonich*, 29 F.3d 1398, 1407 (9th Cir. 1994). The court "has no discretion to abstain in cases that do not meet the requirements." *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 939 (9th Cir. 2002).

## A

The array of cases dealing with waterways and water-based transportation in Washington state suggests that regulation of water traffic is indeed a sensitive issue of social policy in Washington. *See Rancho Palos Verdes Corp. v. City of Laguna Beach*, 547 F.2d 1092, 1094 (9th Cir. 1976) (pointing to the "array of state constitutional provisions and statutes" involving land use planning as evidence that it is "a sensitive area of social policy" in California). Given the ubiquity of waterways in Washington, and the unique importance of water navigation in the Lake Chelan area specifically, it follows that regulation of water routes and resources in the area would be of great concern to the state. *See Reetz*, 397 U.S. at 87 (noting that "fish resources" was

"an asset unique in its abundance in Alaska," and that "the management [of fish resources was] a matter of great state concern").

**B**

In addition, "[a] state court decision . . . could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." *Id.* at 86–87. If, for example, the WUTC issues a declaratory order that the "charter" boat service proposed by the Courtneys is not "for the public use for hire," within the meaning of Washington Revised Code § 81.84.010(1), the PCN requirement would not apply to them and the claim would be rendered moot. The Courtneys have challenged the state statutory scheme *as applied* to their proposed transportation services. A decision by the WUTC that the Courtneys do *not* need a PCN certificate to operate their proposed services would obviate the need for this constitutional challenge.

Moreover, even if the WUTC concludes that the PCN requirement applies to the Courtneys' proposed services, a contrary ruling by the Washington Supreme Court could also potentially render their constitutional challenge unnecessary. *See England v. La. State Bd. of Med. Examiners*, 375 U.S. 411, 424 (1964) (Douglas, J., concurring) ("Where state administrative action is challenged, a federal court will normally not intervene where there is an adequate state court review which is protective of any federal constitutional claim.").

## C

Finally, as discussed above, it is not clear whether the PCN requirement applies to the private boat transportation services the Courtneys wish to provide. An issue of state law is "uncertain" if "a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law." *Pearl Inv. Co. v. City and Cnty. of S.F.*, 774 F.2d 1460, 1465 (9th Cir. 1985).

The PCN requirement in Washington Revised Code § 81.84.010 only applies to vessels or ferries "for the public use for hire." That phrase has yet to be applied in a formal agency opinion or by any state court to the services the Courtneys propose. The WUTC's 2010 Ferry Report indicated that it "might reasonably conclude that a boat service offered on Lake Chelan (and elsewhere) in conjunction with lodging at a particular hotel or resort, and which is not otherwise open to the public, does not require a certificate under [Washington Revised Code § 81.84.010]," but also that "the commission could . . . decide not to adopt that interpretation." Ferry Report 15. Notwithstanding allegations in the Courtneys' complaint that suggest the WUTC would hold them subject to the PCN requirement, it remains unclear how the Washington Supreme Court would interpret the statutory provision at issue with respect to the Courtneys' proposed services.[8]

---

[8] The Washington Supreme Court's decision in *Kitsap* dealt with a private club that initiated a boat transportation service reserved for its members and their guests only. 30 P.2d at 235. The court concluded that the service was still considered a "common carrier" and was subject to the PCN requirement. *Id.* In doing so, the court emphasized that the "club boat" was, in practice, essentially a competing public ferry service. *Id.* at 236. *Kitsap* is the only Washington case to have disapproved of a "private

**D**

In light of the foregoing, the district court did not abuse its discretion in abstaining from adjudication of the Courtneys' second claim for relief. Nevertheless, the district court should have retained jurisdiction over the case pending resolution of the state law issues, rather than dismissing the case without prejudice. We have generally considered dismissal inappropriate following *Pullman* abstention. *See Fireman's Fund Ins. Co.*, 302 F.3d at 940 ("If a court invokes *Pullman* abstention, it should stay the federal constitutional question until the matter has been sent to state court for a determination of the uncertain state law issue." (internal quotation marks and citation omitted)); *Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791, 802 (9th Cir. 2001) (same); *Int'l Bhd. of Elec. Workers, Loc. Union No. 1245 v. Pub. Serv. Comm'n of Nev.*, 614 F.2d 206, 213 (9th Cir. 1980) (finding dismissal following *Pullman* abstention improper pending Nevada courts' resolution of state issues); *Santa Fe Land Improvement Co. v. City of Chula Vista*, 596 F.2d 838, 841 (9th Cir. 1979) ("If the court abstains under *Pullman*, retention of jurisdiction, and not dismissal of the action, is the proper course.").

---

charter" service, and the WUTC recognized that "a boat service offered . . . in conjunction with lodging at a particular hotel or resort, and which is not otherwise open to the public, [might] not require a certificate." Ferry Report 15. The "shuttle" and "charter" services proposed by the Courtneys would be appurtenant to their Stehekin-based businesses and presumably be operated solely for patrons of these businesses. However, the Courtneys' complaint does not provide specific details regarding their proposed boat services, and it is therefore difficult to compare those services to the "club boat" scenario. Thus, the *Kitsap* case does not help us predict with any confidence how the Washington Supreme Court would rule on this issue.

The Supreme Court has found dismissal without prejudice following *Pullman* abstention to be appropriate where Texas law precluded a grant of state declaratory relief if a federal court retained jurisdiction. *See Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 88 n.14 (1975). The same does not appear to be true, however, in Washington. *See Rancho Palos Verdes Corp.*, 547 F.2d at 1096 (distinguishing California law from Texas law and the *Harris* decision in holding that the district court should have retained jurisdiction following *Pullman* abstention); *Brown v. Vail*, 623 F. Supp. 2d 1241, 1247 (W.D. Wash. 2009) (retaining jurisdiction following exercise of *Pullman* abstention, citing, *inter alia*, *Columbia Basin*, 268 F.3d at 802).

Despite its proper invocation of the *Pullman* doctrine, the district court erred in dismissing the Courtneys' second claim. Therefore, we vacate and remand the Courtneys' second claim with directions that the district court enter an order retaining jurisdiction over the constitutional claim. *See Isthmus Landowners Ass'n, Inc. v. California*, 601 F.2d 1087, 1090–91 (9th Cir. 1979) (finding failure to retain jurisdiction after *Pullman* abstention to be reversible error).

### CONCLUSION

The district court's dismissal of the Courtneys' first claim for relief is **AFFIRMED**. The dismissal of their second claim for relief is **AFFIRMED** in part, **VACATED** in part, and **REMANDED** with instructions that the district court retain jurisdiction over the constitutional question.

The parties shall bear their own costs of appeal.